SIXTH DIVISION
March 31, 2006

No. 1-04-3695

|                                          |   |                        |
|------------------------------------------|---|------------------------|
|                                          | ) |                        |
|                                          | ) |                        |
|                                          | ) |                        |
| RITA AHMAD,                              | ) | Appeal from the        |
|                                          | ) | Circuit Court          |
|     Plaintiff-Appellee, | ) | of Cook County.     |
|                                          | ) |                        |
|     v.               | ) | No. 03 CH 21482        |
|                                          | ) |                        |
| THE BOARD OF EDUCATION OF THE CITY       | ) | Honorable              |
| OF CHICAGO,                              | ) | Martin S. Agran,       |
|                                          | ) | Judge Presiding.       |
|     Defendant-Appellant | ) |                     |
|                                          | ) |                        |
| (HENRY GALATZ and ILLINOIS STATE         | ) |                        |
| BOARD OF EDUCATION,                      | ) |                        |
|                                          | ) |                        |
|     Defendants-Appellees). | ) |                  |

JUSTICE O'MALLEY delivered the opinion of the court:

On December 13, 2001, defendant, the Board of Education of the City of Chicago (Board), charged plaintiff, Rita Ahmad, a tenured teacher, with numerous violations of the Board's Employee Discipline Code. The Board alleged, *inter alia*, that plaintiff misappropriated the merchandise of a nonprofit organization for the benefit of her unauthorized secondary business by falsely representing herself as an agent of the Chicago Public Schools (CPS). A hearing officer then sustained the Board's charges. The circuit court reversed the Board's decision and ordered that it reinstate plaintiff with back pay.

On appeal, the Board challenges the decision of the circuit court, claiming that the hearing officer's initial decision was correct. By contrast, plaintiff insists the hearing

1-04-3695

officer erred by misapplying the standard set forth by our supreme court in <u>Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622</u>, 67 Ill. 2d 143, 153 (1977), which generally governs the dismissal of tenured teachers.  In our view, plaintiff's conduct here is properly characterized as immoral, indeed even criminal, and is therefore irremediable *per se*, as defined by an amendment to the Illinois School Code (Code).  105 ILCS 5/34-85 (West 2000).  Thus, the present case is not controlled by the application of <u>Gilliland</u> but rather by an amendment to the Code as explained in <u>Younge v. Board of Education of the City of Chicago</u>, 338 Ill. App. 3d 522, 533-34 (2003).  We therefore uphold the Board's decision and reverse the circuit court's order to reinstate plaintiff.

BACKGROUND

Plaintiff, a tenured teacher at the time of this action, began working for the Board in 1961.  Plaintiff's last classroom assignment was at the Bryn Mawr School during the spring semester of the 1998-1999 school year.  During that spring semester, Ahmad was removed from her classroom for disciplinary reasons and reassigned to the Board's Office of Schools and Regions, where she did not retain any teaching or classroom

1-04-3695

responsibilities.[1]

On December 13, 2001, the Board charged plaintiff with violating several provisions of the CPS Employee Discipline Code. The Board's complaint alleged that plaintiff misappropriated supplies from a nonprofit organization by misrepresenting herself as an agent of CPS. The complaint further alleged that plaintiff obtained the supplies with the intent of selling them through plaintiff's business, entitled "Ology Parent-Teacher, One Stop Educational Supplies."

On November 13, 2002, a proceeding before a hearing officer revealed the following.

[1]The record does not reveal what "disciplinary reasons" prompted the Board to remove plaintiff from her classroom. Dr. Barbara Moore, plaintiff's supervisor, testified that the Board removes individuals from the classroom and relocates them at the Office of Schools and Regions for disciplinary reasons.

1-04-3695

On October 5, 2001, plaintiff applied for membership in the National Association for the Exchange of Industrial Resources (NAEIR). Robert Gilstrap, vice president and chief financial officer of NAEIR, testified before the hearing officer. He stated that NAEIR, a nonprofit organization, allows its members to obtain donated items, including school supplies, for a small service fee and delivery charge. NAEIR restricts its membership to organizations and does not allow individual memberships. Plaintiff testified at the hearing that she applied to NAEIR after seeing an article and advertisement in the February 2000 Chicago Union Teacher (CUT) newspaper. The CUT article included the following passage which related to the services and products that NAEIR provided:

"**Free materials offered for classroom use**

Teachers who are spending their own money on supplies for their classrooms can get a bargain on many items through a nationwide not-for-profit program called Member's Choice.

* * *

Participant's pay a one-time $29.50 registration fee, then receive quarterly mini-catalogs and monthly fliers, with items available for shipping and handling costs ranging from $20- $50. Values of the goods range from $100 to $500.

* * *

The materials must be used in the school setting or given to students." (Emphasis in the original).

˅4˅

1-04-3695

Plaintiff subsequently contacted NAEIR in an effort to secure membership. On her initial application, plaintiff represented herself as a teacher and that she was applying for membership on behalf of a Chicago public school. Plaintiff, however, listed her home address and telephone number as the applying organization's address on the application form. This application also included the following preprinted language:

"In accordance with Section 170(e)(3) of the U.S. Internal Code [*sic*], materials received through NAEIR are to be used for the care of the ill, needy or minors and shall not be bartered, traded or sold."

According to Gilstrap's testimony, NAEIR sent back this initial application because it lacked a school address and the name of a school. A handwritten message on the returned application indicated that "[i]tems requested must be shipped to the organization" and "need school address." In response to this request, plaintiff identified her organization as the "Chicago Public Schools, Office of Schools and Regions c/o Rita Ahmad." Plaintiff submitted this application by facsimile with the assistance of Dr. Barbara Moore, plaintiff's supervisor at the Office of Schools and Regions. Dr. Moore testified before the hearing officer that plaintiff told her the purpose of the facsimile concerned a matter relating to the Bryn Mawr School, a school that previously employed plaintiff. Dr. Moore further testified that as a practice she always asked whether an item sought to be faxed by an individual related to school business. Only if an individual responded affirmatively to such a question would Moore fax the item.

NAEIR then sent plaintiff a welcome letter which, in relevant part, stated: "Your

1-04-3695

application has been processed and CHICAGO PUBLIC SCHOOLS OFFICE OF SCHOOLS AND REGIONS has been issued this member number:  045494 3001 *** Carefully read the enclosed 'Member's Choice Rules and Instruction sheet *** .' "  At the bottom of this letter a second statement read:

"CHICAGO PUBLIC SCHOOLS

OFFICE OF SCHOOLS AND REGIONS

Member's Choice

Membership Number:

04594 3001"

Plaintiff proceeded to place 16 orders of school supplies from NAEIR worth a value of $33,979.  On at least 12 of these orders plaintiff marked "Chicago Public Schools/Office of Schools and Regions" in her own handwriting under "Organization Name."  Also, on these 12 order forms, plaintiff used the membership number "045494 3001," which NAEIR had previously assigned to the Chicago Public Schools/Office of Schools and Regions.  NAEIR billed plaintiff $4,567.50 in shipping charges for the school supplies.

NAEIR proceeded to send plaintiff numerous invoices for the merchandise she ordered which all contained the following warning:

"Payment of this invoice acknowledges that your

organization will use the merchandise received through

NAEIR in accordance with the provisions of IRS Code

170(e)(3).  The merchandise will not be bartered, traded or

1-04-3695

sold and in keeping with the TERMS OF THE

MEMBERSHIP, will be used for the care of the ill, needy or

infants (minors).  It is also understood that your organization

will keep a record of this transaction for the IRS in the event

they wish to verify the transaction."

As of November 14, 2002, NAEIR had not received payment from plaintiff for the school

supplies.  Dr. Moore also testified that NAEIR later contacted her office seeking

compensation for an outstanding bill.  After Dr. Moore questioned plaintiff about this

outstanding bill, plaintiff informed her the bill had nothing to do with "Schools and

Regions" and that "she would take care of it."

John Connolly, a Board investigator who inquired into plaintiff's relationship with

NAEIR, also testified before the hearing officer.  After contacting personnel at NAEIR,

Connolly had deduced that NAEIR returned plaintiff's original application for

membership because it lacked adequate processing information and that NAEIR

eventually approved the application after plaintiff both added the name "Office of

Schools and Regions" to her application and returned the revised application to NAEIR

via facsimile with an "Office of Schools and Regions" cover sheet.  Connolly also stated

that plaintiff informed him that she did not want to be interviewed, the matter was

private, and was none of the Chicago Public School's business.  After reviewing various

documents, such as the NAEIR invoice and membership application forms mentioned

above, and interviewing various individuals, including NAEIR personal and Dr. Moore,

Connolly concluded Ahmad had falsified her status as an agent of CPS in an effort to

obtain merchandise from NAEIR.

At the hearing, plaintiff claimed, among other things, that she had not understood from the various documents introduced at the hearing that NAEIR excluded individuals like herself from its program. In particular, she noted that the advertisement discussed previously referred to teachers; thus, she did not believe the program excluded her. She also claimed she listed "Office of Schools and Regions" as her organization name on her NAEIR application form because Dr. Moore informed her that although she no longer worked at a school, she had been reassigned to the "Office of Schools and Regions." Plaintiff further asserted that she never requested that Dr. Moore fax her application to NAEIR. Plaintiff claimed the warning on the application--that the goods received may not be sold and that the materials ought to be used for the ill, needy or minors--was just a suggestion. Plaintiff testified that she formed her business, which she had entitled "Ology Parent Teacher Supplies," to provide supplies that could not generally be found in stores like "Toys R Us," and to educate parents on how to teach their children. Plaintiff further stated she would have stopped teaching had her business succeeded. She also testified that during the time she accumulated items from NAEIR, she was still employed by the Board, but was not actually teaching. Although plaintiff acknowledged she originally obtained the items to sell through her business, she eventually donated all items received from NAEIR and introduced receipts from various nonprofit organizations to this effect. She did so while aware of an ongoing investigation into her conduct by the Board. She also claimed she did not compensate NAEIR for shipping expenses because of financial difficulties caused by

1-04-3695

her excessive sick days without pay, and that her lack of business skills and funds caused her business to fail.

After evaluating the various testimonies and exhibits at the proceeding, the hearing officer remarked in his order:

> "Based upon the evidence presented it is clear that some if not the majority of the materials secured through NAEIR would have been used in the furtherance of Ahmad's private business venture.
>
> In extending every benefit of the doubt to Ahmad it is both illogical and unreasonable to conclude that Ahmad believed that she could acquire product from NAEIR, and thereafter do with that product as she saw fit. The NAEIR materials make it very clear in terms of who may be a member, what requirements a member must meet, what obligation a member assumes in terms of payment requirements, and how a member must ultimately use the product that it receives from NAEIR."

The hearing officer decided the case by applying an analysis applicable to teacher dismissals set forth by our supreme court in Gilliland, 67 Ill. 2d at 153. There, the court set out the standard a school board must meet so that it may terminate a teacher without the procedural safeguards typically afforded to tenured teachers. To dismiss a teacher without such safeguards, according to the Gilliland court, a board must

demonstrate that a teacher's conduct is "irremediable." To do so, the Board must prove, by a preponderance of the evidence, that: (1) the teacher's conduct caused significant damage to students, faculty, or the school; and (2) the teacher would not have corrected his conduct, even if he had been issued a written warning and afforded a period of time for remediation. Gilliland, 67 Ill. 2d at 153. Analyzing the first prong of Gilliland, the hearing officer determined that the Board, its students, and its faculty were damaged in at least three ways. First, based on plaintiff's actions, NAEIR could refuse future membership to CPS which, in turn, could deprive CPS of future affordable services and products in an era of limited school budgets. Second, NAEIR could rightfully seek compensation from the Board for all the unpaid supplies plaintiff ordered in its name. Third, plaintiff's actions could jeopardize NAEIR's Internal Revenue Service tax-exempt status and, as a consequence, may expose CPS to liability for its contributing role to this status change.

Turning to the second Gilliland prong, namely, whether plaintiff would have corrected her conduct if she had been issued a written warning and a period of time for remediation, the hearing officer concluded that plaintiff's impermissible conduct was of a continual nature and thus irremediable. He concluded the proceedings by sustaining the Board's charges and by stating:

> "It has been determined that Rita Ahmad has
> engaged in activities that have resulted in her securing
> merchandise and related services to which she was not
> otherwise entitled which in turn resulted in gain to Ahmad

1-04-3695

and liability to both NAEIR and the Chicago Public Schools. It was through these efforts and activities that an impermissible misappropriation occurred.

It has been determined that Rita Ahmad has engaged in activities during work time that were intended to further a secondary business. At the same time it is also acknowledged that Ahmad had limited duties and responsibilities while assigned to the Office of Schools and Regions.

***

It has been determined that Rita Ahmad enlisted the service of Office of Schools and Regions personnel to assist her his [*sic*] securing membership in NAEIR. At the same time is it [*sic*] also acknowledged that the evidence presented in furtherance of this activity was limited to requesting that application material to NAEIR for the purpose of establishing membership be sent out by District personnel."

The Board then adopted the hearing officer's recommendation and terminated plaintiff's employment.

On April 24, 2004, plaintiff filed a complaint for administrative review before the trial court. The trial court found the damages claimed by the Board speculative in

1-04-3695

nature and therefore ordered plaintiff's reinstatement with back pay.  The Board

appealed.

STANDARD OF REVIEW

In administrative review cases, we review the Board's decision, not the circuit

court's decision.  Board of Education of Community Consolidated School District No. 54

v. Spangler, 328 Ill. App. 3d 747, 757 (2002); 735 ILCS 5/3-101 et seq. (West 2002).

Furthermore, the hearing officer acts as the factfinder and in that capacity hears the

testimony of witnesses, determines their credibility and the weight to be given their

statements, and draws reasonable inferences from all evidence produced in support of

the charges against the accused.  Spangler, 328 Ill. App. 3d at 757.  An agency's

findings of fact are considered *prima facie* true and correct.  Grames v. Illinois State

Police, 254 Ill. App. 3d 191, 202 (1993).  Accordingly, a reviewing court will not reverse

an agency's findings unless they are against the manifest weight of the evidence.

Szabo v. Board of Education of Community Consolidated school District No. 54, 117 Ill.

App. 3d 869, 872-873 (1983).  An agency's findings are against the manifest weight of

the evidence only if the opposite conclusion is clearly evident.  Abrahamson v. Illinois

Department of Professional Regulation, 153 Ill. 2d 76, 88 (1992).  Regardless of the

reasoning provided by an agency for its decision, this court may affirm an agency's

decision on any basis appearing in the record.  Younge, 338 Ill. App. 3d at 530; Midwest

Central Educational Ass'n v. Illinois Educational Labor Relations Board, 277 Ill. App. 3d

440, 448 (1995).

Here, the parties do not contest in their appellate briefs, and we will not address,

whether the decision of the hearing officer is against the manifest weight of the evidence. Rather, we address whether the hearing officer erred by applying the standard expressed in Gilliland, 67 Ill. 2d at 153. This presents a question of law, which we review *de novo*. Midwest Central Education Ass'n v. Illinois Educational Labor Relations Board, 277 Ill. App. 3d 440, 444-45 (1995).

ANALYSIS

Under section 10-22.4 of the Code, a tenured school teacher may be removed from employment only for cause. 105 ILCS 5/10-22.4 (West 2002). Two kinds of misconduct may constitute cause. First, "irremediable" misconduct, that is, conduct which causes damage to the students, the faculty or the school itself that could not have been corrected if warnings had been given by the teacher's superiors when they learned of the cause. Yesinowski v. Board of Education of Byron School District No. *226*, 28 Ill. App. 3d 119, 123 (1975). Second, "remediable" conduct, that is, "misconduct by a teacher, in her ordinary course of duties, which, if called to her attention, can ordinarily be remedied"; the term "remediable" has been applied to situations concerning " 'deficiencies in teaching performance [citation] or corporal punishment.' " Younge, 338 Ill. App. 3d at 532, quoting McBroom v. Board of Education of District No. 205, 144 Ill. App. 3d 463, 473-74 (1986).

Before a school district can terminate a tenured teacher who engages in "remediable" conduct, the district must provide a written "Notice to Remedy" of those "causes which, if not removed, may result in charges." 105 ILCS 5/24-12 (West 2002). As noted in Gilliland, 67 Ill. 2d at 153, however, a school district need not take this step

if the teacher's conduct is deemed "irremediable." In the present case, the hearing officer concluded that plaintiff's actions constituted "irremediable" conduct by applying the <u>Gilliland</u> analysis. As mentioned previously, the Supreme Court in <u>Gilliland</u> set forth a two-part analysis pertinent to whether conduct is irremediable: (1) whether the teacher's conduct caused significant damage to students, faculty, or the school; and (2) whether the teacher would not have corrected her conduct, even if she had been issued a written warning and a period of time for remediation. <u>Gilliland</u>, 67 Ill. 2d at 153.

Plaintiff argues that the hearing officer erred in concluding that plaintiff caused damages under the first prong of <u>Gilliland</u> because such damages were of a speculative nature. She further argues that the hearing officer misapplied the second prong of <u>Gilliland</u>, *i.e.*, the hearing officer erred in concluding that plaintiff would not have corrected her conduct if the Board had issued her a written warning and afforded her a period of time for remediation. We agree that the hearing officer misapplied <u>Gilliland</u>, but not for the reasons argued by plaintiff. We deem the analysis provided by <u>Gilliland</u> inapplicable to instances, such as the present case, where conduct clearly warrants an "immoral" classification as stated in the Code and explained in our recent decision in <u>Younge</u>, 338 Ill. App. 3d at 533-34.

In <u>Younge</u>, two teachers tested positive for marijuana in violation of district policy. The teachers were charged with violating several district policies and both were provided a hearing in which the hearing officers affirmed the terminations. The district and the hearing officers considered the teacher's behavior irremediable, thus not requiring the implementation of the warning and progressive discipline procedures

1-04-3695

provided in the Code. We affirmed the Board's decision to terminate the teachers. In so doing, we examined the legislature's amendment of section 34-85 of the Code, which states as follows:

> "No written warning shall be required for conduct on the part of a teacher or principal which is cruel, immoral, negligent, or criminal or which in any way causes psychological or physical harm or injury to a student as that conduct is *deemed to be irremediable*." (emphasis added) 105 ILCS 5/34-85 (West 2000).

Interpreting this amendment, we clarified the irremediable conduct test under Gilliland, by stating:

> "There is no need, however, to apply the Gilliland test in this case. Gilliland was decided almost 20 years before the 1995 Chicago school reform amendments [citation]. The Chicago School Reform Act was enacted in 1998 in an attempt to resolve certain serious problems in Chicago's public school system [citation.] ***
>
> *** Thus, pursuant to section 34-85 of the School Code [citation], it is unnecessary to employ the Gilliland test to cases involving cruel, immoral, negligent, or criminal conduct because the statute now makes this conduct irremediable *per se*. Not only is no warning required for this

˘15˘

type of conduct, but it is also unnecessary for the Board to show that this type of conduct caused damage."  Younge, 338 Ill. App. 3d at 533-34.

We agree with this interpretation of the Code's amendment.  If, as the Code indicates, conduct that is immoral, criminal or negligent is "deemed to be irremediable," it follows that one need not apply the two-pronged Gilliland test.  We now turn to the issue of whether the record shows plaintiff's conduct was indeed "immoral" pursuant to the 1998 amendment to the Code.[2]  Where, as here, a statute does not define a term, we will assign such a term its ordinary and commonly understood meaning and may use a dictionary for this endeavor.  Cojeunaze Nursing Center v. Lumpkin, M.D., 260 Ill. App. 3d 1024, 1029-30 (1994).  Here, the Code does not define "immoral" conduct.  Immoral conduct has been defined as "shameless" conduct showing "moral indifference to the opinions of the good and respectable members of the community."  Black's Law Dictionary 751 (6th ed. 1990).[3]  Applying this definition to the present case, we find that

---

[2] This amendment applies only to schools in Chicago.  105 ILCS 5/34-1 (West 2004) ("This Article applies only to cities having a population exceeding 500,000."); see also Watts v. Board of Education, School District No, 189, 125 Ill. App. 3d 532, 538 (1984) ("[T]he requirements set forth in 34–85 apply to schools in Chicago and do not apply to schools outside Chicago").

[3] As an aside, we reject plaintiff's argument that the

Black's Law Dictionary may not be used as an aide in statutory
construction; more specifically, as an aide to define "immoral
conduct" in the Code.  Illinois courts routinely refer to the
Black's Law Dictionary when determining the meaning of an
otherwise undefined word or phrase.  See, *e.g.*, People v. Ward,
215 Ill. 2d 317, 325 (2005) (relying on Black's Law Dictionary
when determining the meaning of a statutory phrase); People v. Blair,
 215 Ill. 2d 427, 439-45 (2005) (relying on Black's Law Dictionary in defining legal terms
such as "waiver" and "res judicata").  We therefore see no reason why we may not
similarly employ the assistance of a dictionary when determining the meaning of
"immoral" in the Code.

the record reveals an abundance of evidence demonstrating plaintiff engaged in conduct one might properly characterize as immoral, perhaps even criminal, *i.e.*, theft by deception. See 720 ILCS 5/16-1(a)(2) (West 2002) ("A person commits theft when he knowingly: *** [o]btains by deception control over property of the owner").

Initially, we note that the record shows that plaintiff wilfully misled both her employer and NAEIR by falsely representing herself as an agent of CPS to obtain goods from NAEIR while concealing such conduct from CPS. In response to plaintiff's application, NAEIR requested additional information. Plaintiff then asked Dr. Moore, her supervisor, to send a facsimile to NAEIR identifying her "organization" as the "Chicago Public Schools, Office of Schools and Regions c/o Rita Ahmad." When Moore asked plaintiff whether the facsimile was related to school business, plaintiff answered yes. She did so while knowing she intended to use the product for her own business, rather than for the benefit of the school. Plaintiff proceeded to place 16 orders of school supplies from NAEIR worth a value of $33,979. Further, on at least 12 occasions she named the "Chicago Public Schools/Office of Schools and Regions" as the organization requesting merchandise, rather than naming her own business venture. Also on these 12 occasions, plaintiff used the membership number "04594 3001" on the NAEIR order forms, which NAEIR had previously assigned to the Chicago Public Schools/Office of Schools and Regions. Later, plaintiff informed John Connolly, a Board investigator investigating plaintiff's relationship with NAEIR, that she did not want to be interviewed, that the matter was private, and that the matter was none of the Chicago Public School's business. She also refused to discuss this matter with Dr. Moore, her

1-04-3695

supervisor.

The foregoing evidence persuades us that plaintiff intentionally misled both NAEIR and her employer as to the true nature of her intentions concerning the merchandise she obtained from NAEIR, which, according to her own testimony, was to sell through her business venture. We further concur with the hearing officer's conclusion that plaintiff's claimed ignorance as to the permissible use of NAEIR products is disingenuous, unreasonable, even feigned, in light of the clear admonishments appearing on NAEIR's application form and numerous order forms that plaintiff signed. Finally, plaintiff's later decision to donate her ill-gotten merchandise does not negate the original immoral conduct plaintiff engaged in to acquire the merchandise. It is completely unreasonable to believe that plaintiff acquired $33,979 worth of merchandise for the purpose of donating it to the Salvation Army and other charities.

Although we are mindful that plaintiff apparently has had other "disciplinary" problems which caused her to be removed from a classroom, this fact in no way relieved plaintiff of her responsibility to act in an ethical fashion toward her employer. We have on other occasions affirmed the dismissal of a tenured teacher who has engaged in unethical conduct, although the offending conduct did not involve students and did not occur on the school premises. See *e.g.*, McCullough v. Illinois State Board of Education, 204 Ill. App. 3d 1082, 1090 (1990) (affirming the dismissal of a teacher with a criminal tax conviction and noting that "[w]here [a teacher] can no longer function as a role model to impart basic societal values and qualities of good citizenship to his students, his conduct is irremediable"); Chicago Board of Education v. Payne, 102 Ill.

1-04-3695

App. 3d 741, 748 (1981) (affirming the dismissal of teacher who pled guilty to possessing marijuana, outside of school, and noting, "[w]e do not doubt that knowledge of a teacher's involvement in illegalities such as possession of marijuana would have a major deleterious effect upon the school system and would greatly impede that individual's ability to adequately fulfill his role as perceived by the Board."); Scott v. Board of Education of Alton, Community Unit School District No. 11, 20 Ill. App. 2d 292, 295-96 (1959) (teacher's dismissal for two public intoxication arrests occurring outside of school affirmed where the court found the incidents were not in keeping with the "dignity and leadership" the Board desired for teachers).

These cases stand for the proposition that where teachers indulge in conduct that is immoral at best, and criminal or quasi-criminal at worst, they demonstrate a basic character flaw which makes their future employment at the Board of Education, which is partially responsible for molding the character of our youth, untenable. Although plaintiff had previously been removed from direct contact with children, this incident makes clear that she is not capable of modeling societal values for children and therefore could not return to the classroom, should that option arise. She has also abused her current assignment thereby making dismissal entirely appropriate. For these reasons, we reverse the judgement of the circuit court and reinstate the decision of the hearing officer.

CONCLUSION

We conclude that the Board's decision to terminate plaintiff for cause was supported by the evidence. Accordingly, we reinstate the hearing officer's decision and reverse

˘20˘

1-04-3695

the judgement of the circuit court.

Reversed.

TULLY and FITZGERALD-SMITH JJ., concur.