# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Young-Gibson v. Board of Education of the City of Chicago*, 2011 IL App (1st) 103804

---

| | |
|---|---|
| Appellate Court Caption | DARREYL YOUNG-GIBSON, Plaintiff-Appellee, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3804 |
| Opinion filed | September 30, 2011 |
| Rehearing denied | November 17, 2011 |
| Modified opinion filed | November 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court erred in holding that the Board was required to comply with section 34-85 of the School Code in removing petitioner as principal. The Board properly followed the procedural requirements of sections 34-8.3(a), (b) and (c) of the Code. The Board's decision to remove petitioner as principal was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-48425; the Hon. Michael B. Hyman, Judge, presiding. |
| Judgment | Confirmed; motion denied. |

Counsel on
Appeal

Patrick J. Rocks, Susan M. O'Keefe, and Lee Ann Lawder, all of Board of Education, of Chicago, for appellant.

Leonard D. Litwin, of Sheldon Hodes & Associates, of Chicago, for appellee.

Panel

JUSTICE CAHILL delivered the judgment of the court, with opinion.
Justices McBride and Garcia concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant the Board of Education of the City of Chicago (Board) appeals the trial court's grant of a petition for writ of *certiori* and order reinstating plaintiff Darreyl Young-Gibson to her position as principal at Percy L. Julian High School (Julian). The Board contends that the trial court erred in holding the Board was required to terminate plaintiff in accordance with the procedures outlined in section 34-85 of the School Code (Code) (105 ILCS 5/34-85 (West 2008)). We reverse.

¶ 2    Plaintiff was selected as principal of Julian in 2008. Sections 5(b) and (g) of plaintiff's four-year contract with the Board provided that she could be removed for cause as principal before the expiration of her term under section 34-85 of the Code or removed "to the extent permitted" under sections 34-8.3 and 34-8.4 of the Code (105 ILCS 5/34-8.3, 34-8.4 (West 2008)).

¶ 3    On July 20, 2009, the Board's chief executive officer (CEO) sent plaintiff a letter informing her that he was considering removing her from her principalship at Julian and terminating her contract due to Julian's failure "to make adequate progress to address the deficiencies that have placed it on probation."

¶ 4    On August 24, 2009, a hearing officer heard evidence on behalf of the CEO and plaintiff. The CEO called three witnesses. Ryan Crosby, the Board's director of performance, testified that the CEO's recommendation that plaintiff be removed as Julian's principal was correctly based on section 34-8.3 of the Code. Crosby said Julian had been on probation since the 2004-05 school year and plaintiff had been principal since January 2008. Plaintiff was subject to removal because Julian had failed to make adequate progress in correcting the deficiencies that resulted in it being placed on probation. Crosby explained that the Board adopted a "Performance and Remediation and Probation Policy" for the 2008-09 school year. Under the policy, schools were assigned points for various levels of performance and improvement based on the "Prairie State Achievement Exam," the ACT, the "Freshman-on-Track Rate," the attendance rate and other performance metrics. Schools were placed into one of three "achievement levels" based on the points, with level three being the probation level. Julian received 30.6% of the possible points, placing it in the probation achievement

level for the 2008-09 school year. Under the Board's policy, schools on probation must achieve a level one or two rating for two consecutive years to be removed from probation. Data from school years between 2004 to 2009 showed that Julian students were performing far below district averages and were not making significant progress in catching up. Due to this lack of progress, Julian was not eligible to be removed from probation for the 2009-10 school year.

¶ 5        Jerryelyn Jones testified that she had over 34 years of experience as a teacher and administrator in the Chicago public schools (CPS) and served 8 of those years as a principal. During the time plaintiff was principal at Julian, Jones served as the area instruction officer for "Area 24," which included Julian. Jones was the CEO's designee to oversee and assess the performance of principals at schools in her area. When plaintiff was selected as principal, Julian had been on CPS probation for five years, and the Illinois State Board of Education (ISBE) was monitoring Julian's recognition status "due to a persistent failure to provide special education services to students consistent with state and federal law" and "a persistent failure to create and maintain a safe and healthful school climate." During the time plaintiff was principal she failed to address these concerns and to provide leadership and, as a consequence, Julian was on the "brink" of losing state funding and being closed by the ISBE.

¶ 6        Jones said that after plaintiff had been principal for eight months, the ISBE lowered Julian's status from "fully recognized" to "recognized pending further review." Plaintiff was ordered to appear at a meeting by the ISBE's division coordinator to discuss Julian's downgraded status, but plaintiff did not attend the meeting or send a substitute representative.

¶ 7        Seven months later the ISBE again downgraded Julian's status by placing the school on probation "due in large part to the inadequacy of [plaintiff's] leadership at [Julian]." Jones explained that the ISBE assistant superintendent notified the CEO that the State was placing Julian on probation due to " 'evidence of ongoing failure to serve students according to relevant legal and regulatory standards and prolonged non-compliance with legal and regulatory requirements in the area [of] Special Education Services.' " The ISBE found that plaintiff's failure to implement procedures to improve special education services at Julian " 'indicated a lack of intention to achieve progress.' " The ISBE also noted that plaintiff failed to demonstrate managerial expertise in improving student safety.

¶ 8        Jones said that as a result of being placed on probation status, the ISBE required Julian to develop and submit to the ISBE a corrective action plan to cure the existing deficiencies and effectively implement that plan. A failure to do so could result in the ISBE designating Julian as "non-recognized" and ineligible to receive state funding, effectively closing the school. Given the potential consequences, the CEO reassigned plaintiff to an administrative position and appointed an interim principal.

¶ 9        Jones testified that plaintiff lacked the knowledge, skills, abilities, leadership capabilities and collaborative working style required to bring Julian back from the "brink" of closure. Jones made four observations to support her opinion.

¶ 10        First, plaintiff "demonstrated an inability to center the school around instruction" and "collaboratively engage and develop staff to deliver high quality instruction to Julian

students." Rather than improving the delivery of services to students within the Julian attendance boundary, plaintiff focused her efforts on increasing Julian's enrollment from students outside the Julian attendance area, without admission criteria and contrary to Board practice. Jones provided the following examples of plaintiff's unwillingness and inability to focus the school on instruction and to collaborate with her staff:

(1) During the 2008-09 school year, plaintiff failed to give guidance counselors access to student programs so that counselors could advise students on graduation requirements to ensure senior students could meet them.

(2) Plaintiff failed to staff the school properly. For example, plaintiff allowed a teacher to teach a Spanish class who did not know Spanish and was not certified.

(3) Plaintiff failed to program the school properly when the school year started on September 2, 2008. As a result, students lost a great deal of instruction time as the programming problems were not remedied until early October.

(4) Many Julian teachers did not issue textbooks until October 24, 2008, due to plaintiff's failure to plan properly for the opening of the school year. As a result, students spent about two months without appropriate educational materials.

(5) Student ID cards were not issued until October 24, 2008, creating student safety issues.

(6) Jones received complaints from parents about the programing and textbook issues, and plaintiff initially failed to meet with the parents and address their concerns. When she eventually met with them, she was "terse and dismissive of [their] concerns." Jones was forced to "issue discipline" to plaintiff to compel her to respond appropriately to the parents.

(7) Plaintiff failed to submit teacher evaluations for the 2008-09 school year although she was trained to do so, received repeated reminders and Board policy requires it.

(8) Two weeks before graduation, about half of the 2009 graduating class was found ineligible to graduate because the counseling department had not kept adequate student records. After assistance from Jones and area staff, finally nearly 20% of the students were found ineligible to graduate.

¶ 11    Second, plaintiff demonstrated an inability to provide a safe and secure teaching and learning environment. Despite the support and resources offered by Jones and her staff, plaintiff resisted the assistance and refused to cooperate to improve the safety issues at Julian. Plaintiff continued to do so even after Jones took disciplinary measures against her and the Board issued plaintiff a formal warning resolution. As a result, the school climate further deteriorated, as evidenced by two safety audits conducted at Julian in April and December 2008.

¶ 12    Third, plaintiff demonstrated an inability to supervise maintenance staff to make Julian clean, safe and healthful for students, faculty staff and visitors. Plaintiff failed to properly manage maintenance personnel, exacerbating problems at Julian's facilities.

¶ 13    Jones' fourth observation claimed that plaintiff was unable to cooperatively or collaboratively work with parents and central and area offices. From the start of her

appointment as principal, plaintiff resisted all efforts by Jones, the safety and security department, the operations department, the "Office of High School Programs" and the CEO to improve the environment at Julian. Plaintiff was dismissive of parental complaints about her failure to meet the needs of the students. On March 7, 2009, the local school council chairman, on behalf of the Julian local school council, asked the CEO to take steps to dismiss plaintiff. Jones concluded that plaintiff "has amply demonstrated that she is unable to do what is necessary to avoid [being shut down by the ISBE] and must be removed."

¶ 14    John Cooke testified that he was employed by the Board as director of asset management. Cooke managed the facilities at 650 Chicago schools and developed and managed an annual budget of about $256 million.

¶ 15    Cooke said that plaintiff ignored and sometimes condoned her chief engineer's harmful behavior at the school. Of the 650 schools for which Cook was responsible, Julian was "one of a very small number of schools that routinely blocked the efforts of the Department of Facilities to maintain and/or improve the physical condition of their school buildings." The Julian administration often refused to allow contractors to enter the school to perform necessary work or allow CPS personnel to enter the building to assess and/or address conditions within Julian. Cooke cited a particular instance where plaintiff ordered a contractor trying to fix the school's fire alarm to leave the school, even when it was apparent that the school's engineer was incapable of fixing the alarm. Also, plaintiff's failure to correct a variety of deficiencies in the school, revealed by a December 2008 safety audit, showed "a pattern of neglect and inattention."

¶ 16    Finally, Cooke said that a review of Julian's maintenance budget for the 2008-09 school year evidenced "the administration's unwillingness to take the necessary steps to create a safe and welcoming environment for all students and staff at Julian." Cooke explained that each CPS school has an annual budget, and if the school fails to spend their funds during the course of the school year, they risk losing those funds the next year. For the 2008-09 school year, Julian's maintenance budget was about $112,000. In April 2009, with about 30% of the school year remaining, it was discovered that $67,000 remained in the school's budget. This showed that Julian's administration "was not putting forth energy or the effort to maintain, much less improve, the building for its students or staff."

¶ 17    Plaintiff testified that on April 3, 2009, she was informed by Jones that she was being reassigned to an administrative position at the Area 23 office. Three months later she received two notices from the CEO, stating that he was considering removing her as principal of Julian.

¶ 18    Plaintiff said that the CEO did not follow the guidelines under section 34-8.3(d) of the Code in removing her and that she was afforded no hearing or opportunity for due process. Julian did not receive a remediation plan for being removed from probation, and on January 10, 2008, Julian's probation status was in review for the 2006-07 school year. Julian's status was changed to "on probation" one month after plaintiff became principal, so she did not have enough time to work to change Julian's status. Plaintiff said that it was inappropriate for the ISBE to change Julian's recognition status because the ISBE did not timely issue a report after visiting the school in 2007 as required by the Illinois Administrative Code. 23

Ill. Adm. Code 1.20, amended at 33 Ill. Reg. 15193 (eff. Oct. 20, 2009).

¶ 19    Plaintiff said that from the start of her appointment as principal on January 23, 2008, to June 2008: (1) Julian passed "North Central Accreditation" and was accredited for the next five years; (2) Julian's 2008 class increased the composite ACT score from 15.8 to 16; and (3) Julian's graduation rate increased from 69% to 88.7%. According to plaintiff, "Julian was well on its way to getting off probation."

¶ 20    Joyce Ingram independently testified in support of plaintiff's removal as principal. Ingram had been a teacher at Julian for five years and said that conditions at the school during plaintiff's principalship were not conducive to learning. The teachers were overwhelmed by the number of students in their classes, there were not enough textbooks for students, and teachers, staff and students did not feel safe at the school. Plaintiff was unresponsive to complaints from senior students and parents and morale was extremely low at the school.

¶ 21    Lee Nelson testified against plaintiff's removal as principal. Nelson was the chair person of Julian's local school council and a parent of two students at Julian. Nelson said that plaintiff's 14-month tenure as principal was too short for her to affect the results at Julian.

¶ 22    Monique Davis testified against plaintiff's removal as principal. Davis said she was a state legislator and a former teacher of the CPS. Davis testified that Jerryelyn Jones and Julian's former principal harassed plaintiff. Parents told Davis they were happy with the support and effort plaintiff made for their children's safety. Davis observed classes at Julian and often found children engaged with the teachers.

¶ 23    Arlesuia Nicole Watson testified that she was a detective with the Chicago police department and spoke as a character witness for plaintiff. Watson said that plaintiff was always concerned about her students and plaintiff made it a point to keep in touch with Watson on a regular basis about concerns within the school.

¶ 24    Julian teacher Nicholas Bell testified on behalf of plaintiff. Bell said plaintiff has been there for her students and had an "open door policy" which allowed students to come to speak with her.

¶ 25    Finally, Eben Credit, Julian local school counsel secretary, testified on behalf of plaintiff. Credit said that Julian should have been given a corrective action plan if it was on probation for the last two years. Julian's requests for more security were denied. After plaintiff was removed, the CPS "suddenly found" additional security.

¶ 26    About 915 documents were entered into evidence by plaintiff at the hearing and on the next day. Plaintiff submitted written statements responding to the written statements in support of her removal of Jones, Crosby and Cooke. Plaintiff denied Jones' testimony that she did not give guidance counselors access to student programs. Plaintiff acknowledged that Julian was on probation when she accepted her principalship but argued that she did not receive "meaningful intervention from the CEO's office" to assist with removing the school from probation. She also said she never received a school improvement plan from the CEO, was never referred to the principal's remediation program and did not receive a written evaluation in violation of her contract and section 34-8.3. Plaintiff accused the Board's department of facilities of sending contractors to Julian to make unnecessary repairs and

disputed Cooke's testimony that $67,000 from Julian's 2008-09 budget was left unspent.

¶ 27      On September 14, 2009, the hearing officer submitted a written report to the CEO. The report concluded that evidence existed to support plaintiff's removal as principal under section 34-8.3 of the Code due to her failure to "adequately address the issues that have chronically plagued Julian, in large part because of her failure or refusal to work with her superiors."

¶ 28      On October 28, 2009, the CEO issued a written memorandum to the Board, recommending plaintiff be removed as principal at Julian under section 34-8.3(d) of the Code and her contract terminated under section 5 of plaintiff's contract. That same day, the Board issued a resolution adopting the findings of the hearing officer and accepting the CEO's recommendation to remove plaintiff as principal at Julian.

¶ 29      Plaintiff filed a complaint in the circuit court for administrative review of the Board's decision and breach of contract. On October 25, 2010, the trial court treated the administrative review count as a writ of *certiorari* and ordered the Board to reinstate plaintiff as principal at Julian. The court said that "section 34-8.3 must be read in conjunction with section 34-85" and that those sections establish that a principal could not be removed during her term except for cause under the procedures set forth in sections 34-8.3 and 34-85 of the Code. The court held that the Board's failure to comply with the procedural requirements of sections 34-8.3 and 34-85 mandated her reinstatement as principal.

¶ 30      The Board filed a motion to reconsider and a motion to stay plaintiff's reinstatement under Supreme Court Rule 305 (Ill. S. Ct. R. 305 (eff. July 1, 2004)) and Supreme Court Rule 308 (Ill. S. Ct. R. 308 (eff. Feb. 26, 2010)). The court entered an order under Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) finding no just reason for delaying enforcement or appeal of the court's October 25, 2010, order.

¶ 31      The Board filed a notice of appeal, and the court stayed plaintiff's reinstatement as principal under Supreme Court Rule 305(b), pending the outcome of this appeal.

¶ 32      We first address whether we have jurisdiction over this case. Plaintiff contends we lack jurisdiction because the trial court's grant of the writ of *certiori* was not an appealable injunction under Supreme Court Rule 307(a)(1) (Ill. S. Ct. R. 307(a)(1) (eff. Feb. 26, 2010)) but a reinstatement under section 34-85 of the Code.

¶ 33      The Board responds that we have jurisdiction because the trial court's order on the *certiorari* claim was not a final judgment since the court did not rule on damages. The Board argues that this makes proper an interlocutory appeal of the reinstatement order.

¶ 34      An injunction is a "judicial process operating in personam and requiring [a] person to whom it is directed to do or refrain from doing a particular thing." (Internal quotation marks omitted.) *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 221, 730 N.E.2d 4 (2000) (quoting *In re A Minor*, 127 Ill. 2d 247, 261, 537 N.E.2d 292 (1989)). Illinois courts construe the meaning of "injunction" in Rule 307(a)(1) broadly, and we should look to the substance, not the form, of an order to determine if it is injunctive in nature. *Skolnick*, 191 Ill. 2d at 221.

¶ 35      First, plaintiff specifically alleges damages under both counts of her complaint. The record is clear that the trial court did not rule on the issue of damages but ordered the Board to reinstate plaintiff.

¶ 36    Next, we disagree with plaintiff's statement that: "[i]t is self evident that if [Plaintiff] was not properly discharged she was still Principal," and so no injunction could have issued. The Board adopted the resolution to remove plaintiff as principal. She was sent a letter notifying her that she was removed from her position as the principal at Julian and her employment with CPS was "terminated." It has been almost two years since plaintiff was removed as principal. While plaintiff attempts to characterize the trial court's order as a "reinstatement" rather than an "injunction," it is clear that ordering the Board to place plaintiff back into her position as principal after almost two years constitutes a judicial order requiring the Board "to do *** a particular thing." See *Skolnick*, 191 Ill. 2d at 221. The trial court's order was a mandatory injunction, and we have jurisdiction over this interlocutory appeal under Supreme Court Rule 307(a)(1).

¶ 37    We now turn to the primary dispute of this case: whether the trial court erred in finding that the Board must use the procedures outlined in section 34-85 of the Code to remove a principal under section 34-8.3(d). The Board contends that under the rules of statutory construction, it is apparent that the Illinois legislature did not intend to require the Board to follow the procedures in section 34-85 to remove a principal. The Board reasons that section 34-85 identifies the process the Board must afford tenured teachers and principals before it terminates them for cause, while section 34-8.3 identifies the actions the Board is authorized to take to address chronically failing schools.

¶ 38    Plaintiff responds that a hearing under section 34-85 was required because the reasons set forth by the Board for plaintiff's removal, such as her failure to implement the school improvement plan and comply with provisions of plaintiff's "Uniform Principal's Performance Contract," are referenced as grounds for removal for cause in section 34-85.

¶ 39    In administrative review cases, we review the Board's and not the circuit court's decision. *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 162, 847 N.E.2d 810 (2006); 735 ILCS 5/2-101 *et seq.* (West 2008). The parties agree that because this issue involves the construction of plaintiff's contract and sections 34-8.3 and 34-85 of the Code, it should be reviewed *de novo*. See *In re Estate of Ellis*, 236 Ill. 2d 45, 50, 923 N.E.2d 237 (2009) (questions of statutory construction are reviewed *de novo*); *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142, 849 N.E.2d 349 (2006) ("[a]n agency's conclusion on a question of law is reviewed *de novo*").

¶ 40    The court's primary function is to give effect to the legislature's intent, and the best indicator of such intent is the plain and ordinary meaning of the statute's language. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332, 898 N.E.2d 631 (2008). Where the language of a statute is clear and unambiguous it will be applied without resort to other aids of construction. *Abruzzo*, 231 Ill. 2d at 332.

¶ 41    For the reasons that follow, we believe that the legislature did not intend to require that the Board follow the procedures outlined in section 34-85 to remove a principal under section 34-8.3(d).

¶ 42    Section 34-8.3(d) authorizes the superintendent, with the approval of the Board, to take certain specific actions when a school on probation fails to make adequate progress after one year:

"(d) Schools placed on probation that, after a maximum of one year, fail to make adequate progress in correcting deficiencies are subject to the following actions by the general superintendent with the approval of the board, after opportunity for a hearing:

(1) Ordering new local school council elections.

(2) Removing and replacing the principal.

(3) Replacement of faculty members, subject to the provisions of Section 24A-5.

(4) Reconstitution of the attendance center and replacement and reassignment by the general superintendent of all employees of the attendance center.

(5) Intervention under Section 34-8.4.

(6) Closing of the school." 105 ILCS 5/34-8.3(d)(1) through (d)(6) (West 2008).

¶ 43    In this case the Board acted under section 34-8.3(d)(2) to remove plaintiff from her position as principal at Julian. Sections 34-8.3(d)(3) and (d)(5) explicitly reference other sections of the Code and require compliance with those sections for remedial actions such as those here to be taken. Section 34-8.3(d)(2) does not. If the legislature intended to subject section 34-8.3(d)(2) to the removal procedures of section 34-85, it could have said so. See, *e.g.*, *Chatham Foot Specialists, P.C. v. Health Care Service Corp.*, 216 Ill. 2d 366, 398, 837 N.E.2d 48 (2005). This evidences the intent of the legislature to allow for the removal of a principal for reasons other than "cause" and without the procedural requirements of section 34-85. See *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117, 866 N.E.2d 227 (2007) (words and phrases in a statute must be construed in light of other relevant provisions of the statute). Further, requiring that removal of a principal could only be achieved through the use of the section 34-85 procedures would make section 34-8.3(d)(2) redundant. See *Moore v. Green*, 219 Ill. 2d 470, 488, 848 N.E.2d 1015 (2006) (we presume the legislature did not intend legislation to be rendered superfluous).

¶ 44    While no Illinois state court has ruled on this issue, in *Head v. Chicago School Reform Board of Trustees*, No. 98 C 3943, 1999 WL 410005 (N.D. Ill. June 4, 1999) (*aff'd but criticized* in *Head v. Chicago School Reform Board of Trustees*, 225 F.3d 794 (7th Cir. 2000)), the court stated:

"[R]eading § 34-8.3 to require the hearing described in § 34-85 creates problems of statutory interpretation. First, requiring the Board to follow the procedures in § 34-85 makes the portion of § 34-8.3 allowing the removal of principals of probationary schools redundant. Statutory interpretation should give effect to every word and section of the statute. [Citation.] Since a principal could be removed for cause under § 34-85 for the same failings that caused the school to be on probation, reading § 34-8.3(d) to require the exact same procedures would relegate removal of the principal under § 34-8.3(d) to a mere subset of removals under § 34-85. Second, § 34-8.3(d)(3)[,] which permits the Board to remove faculty members of probationary schools[,] specifically subjects any removal to the procedures in § 24A-5. Clearly, the legislature knew how to properly define the procedures for implementing its authorizations when it intended to do so. Since a reference to § 34-85 was not included for removing and replacing principals, the legislature did not intend that the Board follow those procedures when removing the principal of a probationary school. See *Clark v. Chicago Municipal Employees Credit*

*Unions*, 119 F.3d 540, 547 (7th Cir. 1997) (stating that failure to include a phrase in one section of the statute implies that the legislature did not intend the phrase to apply to that section of the statute[,] especially when the phrase was used in another part of the statute)." *Head*, 1999 WL 410005, at *5.

¶ 45    We find this reasoning in *Head* persuasive, and in viewing section 34-8.3 as a whole, we believe the Board was entitled to remove plaintiff under section 34-8.3(d)(2) without cause and was not mandated to follow the procedures outlined in section 34-85.

¶ 46    Further, section 34-8.1 of the Code states: "[d]uring the term of his or her performance contract, a principal may be removed only *as provided for in the performance contract* except for cause." (Emphasis added.) 105 ILCS 5/34-8.1 (West 2008). Plaintiff's employment contract explicitly provides that she may be removed as principal under section 34-8.3:

> "[Plaintiff's contract] may be terminated by the Board[ ] before expiration of the term stated in Section I of this Agreement for any one of the following reasons or by any one of the following methods:
>
> ***
>
> (b) removal of the Principal for cause pursuant to 105 ILCS 5/34-85;
>
> * * *
>
> (g) removal, reassignment, layoff or dismissal of the Principal *to the extent permitted* by 105 ILCS 5/34-8.3 and 105 ILCS 5/34-8.4 of the School Code." (Emphasis added.)

¶ 47    The plain language of plaintiff's contract entitles the Board to terminate plaintiff for cause under section 34-85 or to remove her under section 34-8.3 after an opportunity for a hearing. Compare *Head*, 225 F.3d at 805 (in assessing a breach of contract claim, the court found that the principal's contract specifically required compliance with section 34-85). We believe the trial court erred in holding that the Board was required to comply with section 34-85 in removing plaintiff as principal.

¶ 48    We next address whether the Board complied with the procedural requirements of sections 34-8.3(a), (b) and (c) of the Code. During plaintiff's removal hearing she argued that the CEO failed to comply with subsection (b) of section 34-8.3 because Julian was not placed on remediation before being placed on probation. Plaintiff also argued at the hearing, and now argues on appeal, that the CEO failed to comply with subsection (c) of section 34-8.3 because she did not receive a school improvement plan or budget. Plaintiff does not contest the Board's compliance with subsection 34-8.3(a).

¶ 49    Plaintiff's argument about the number of consecutive years Julian had been on probation at the time of the removal hearing is unpersuasive. Section 34-8.3(d) requires a school to be on probation for one year before the Board can take action. The record shows that Julian was placed on probation by the CEO for at least one year, entitling the Board to take action under section 34-8.3(d)(2) to remove plaintiff from her position as principal.

¶ 50    Next, nothing in the statutory scheme requires the CEO to place a school on remediation before probation. A plain reading of section 34-8.3(b)(4) shows that the CEO is authorized

to place a school on probation if the CEO "determines that the problems are not able to be remediated." We also note that section 34-8.3(f) states that, "when the general superintendent deems that the school is in educational crisis it may take immediate corrective action, including the actions specified in this Section, without first placing the school on remediation or probation." Here, the CEO was entitled to find that remediation would be ineffective, place Julian on probation and take action under section 34-8.3(d) to remove plaintiff as principal.

¶ 51 Plaintiff's claim that she did not receive a school improvement plan or school budget under section 34-8.3(c) is belied by the record. Our review of the school improvement plan and budget shows that they comply with the requirements of section 34-8.3(c) and specify a number of steps to remedy the numerous academic problems at Julian. Plaintiff signed off on the 2008-10 "CPS [School Improvement] Planning Report" and budget. Plaintiff is listed as being responsible or partially responsible for 102 out of 160 listed activities on the budgetary planning pages.

¶ 52 In its reply brief the Board refers to the 2008-09 budget at Julian in arguing that "[t]here is no evidence in the record that [plaintiff] did not undertake or direct any activities listed in the [school improvement plan] *** for the 2008-2009 school year." The Board includes in its reply brief appendix a Board resolution from August 27, 2008, that adopts the annual school budget for the 2009 fiscal year and asks that we take judicial notice of this document. Plaintiff has filed a motion to strike this portion of the Board's argument as well as the documents attached in the appendix, contending that they are not part of the record because they were not introduced at plaintiff's hearing. We deny plaintiff's motion to strike, and we take judicial notice of the Board's approval of the 2009 fiscal year budget because it is a public document containing facts capable of instant and unquestionable demonstration. *City of Chicago v. Illinois Labor Relations Board, Local Panel*, 392 Ill. App. 3d 1080, 1083, 913 N.E.2d 12 (2009) (citing *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159, 355 N.E.2d 7 (1976) (*per curiam*)).

¶ 53 Our review of the record shows that the 2008-10 school improvement plan was approved by the local school council and plaintiff on April 15, 2008. Section II(d) of plaintiff's contract states that "after a [school improvement plan] has been approved by the Local School Council, the Principal shall be responsible for the implementation of the approved [p]lan." Plaintiff had the ability to begin implementing the improvement plan beginning August 27, 2008, when the Board approved the 2009 budget. This rebuts plaintiff's contention that she "was given only 37 days" to implement the plan and move Julian off probation before being reassigned to an administrative position. Further, plaintiff's assertion that "37 days is not enough time to even begin to move the school off probation" is unpersuasive. Nothing in section 34-8.3 requires a minimum amount of time for a school improvement plan to be in place before the Board can remove a principal.

¶ 54 We find that the Board complied with the procedural requirements of sections 34-8.3(a), (b) and (c) of the Code.

¶ 55 Finally, we determine whether the Board's decision to terminate plaintiff as principal was against the manifest weight of the evidence.

¶ 56    In administrative review cases the hearing officer functions as the fact finder, determines witness credibility and the weight to be given to their statements and draws reasonable inferences from all evidence produced in support of the charges against the accused. *Ahmad*, 365 Ill. App. 3d at 162. An agency's findings of fact are considered *prima facie* true and correct, and we will reverse an agency's findings only where they are against the manifest weight of the evidence. *Ahmad*, 365 Ill. App. 3d at 162. "A finding is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Vancura v. Katris*, 238 Ill. 2d 352, 385-86, 939 N.E.2d 328 (2010). We may affirm an agency's decision on any basis supported by the record. *Ahmad*, 365 Ill. App. 3d at 162.

¶ 57    The Board's decision to terminate plaintiff as principal of Julian was not against the manifest weight of the evidence. The evidence shows that plaintiff failed to make adequate progress in correcting the deficiencies that resulted in Julian being placed on probation. Julian received 30.6% of possible achievement level points under the school's "Performance and Remediation and Probation Policy," placing it in the probation achievement level for the 2008-09 school year. Due to a lack of progress, Julian was not eligible to be removed from probation for the 2009-10 school year.

¶ 58    During the time plaintiff was principal she failed to provide adequate leadership and consistently showed an inability to work with other administrators to improve the situation at Julian. Plaintiff was ordered to appear at a meeting by the ISBE's division coordinator to discuss Julian's downgraded status, but plaintiff did not attend the meeting or send a substitute representative. The ISBE noted that plaintiff's failure to implement procedures to improve special education services at Julian "indicated a lack of intention to achieve progress," and plaintiff failed to demonstrate managerial expertise in improving student safety. Jerryelyn Jones testified that plaintiff lacked the knowledge, skills, abilities, leadership capabilities or collaborative working style required to prevent Julian from closing. Specifically, Jones said that: (1) plaintiff "demonstrated an inability to center the school around instruction" and "collaboratively engage and develop staff to deliver high quality instruction to Julian students"; (2) plaintiff demonstrated an inability to provide a safe and secure teaching and learning environment, as evidenced by two 2008 safety audits; (3) plaintiff demonstrated an inability to supervise maintenance staff to make Julian clean, safe and healthful for students, faculty staff and visitors; and (4) plaintiff was unable to work cooperatively or to collaborate with parents and central and area offices and had lost the confidence of the Julian local school council.

¶ 59    Numerous examples were provided that demonstrated plaintiff's unwillingness and inability to focus the school on instruction and to collaborate with her staff. Plaintiff resisted efforts by Jones, the safety and security department, the operations department, the office of high school programs and the CEO to improve the environment at Julian. The record also shows that plaintiff failed to properly spend the funds allocated to Julian for the 2008-09 school year. John Cooke testified that this showed Julian's administration "was not putting forth the energy or the effort to maintain, much less improve, the building for its students or staff."

¶ 60    Viewing the evidence as a whole, we believe the Board's decision to remove plaintiff as

principal at Julian is supported by the record and was not against the manifest weight of the evidence.

¶ 61     For the aforementioned reasons, we believe that: (1) the trial court erred in holding that the Board was required to comply with section 34-85 in removing plaintiff as principal; (2) the Board properly followed the procedural requirements of sections 34-8.3(a), (b) and (c) of the Code; and (3) the Board's decision to remove plaintiff as principal was not against the manifest weight of the evidence.

¶ 62     We reverse the trial court's finding that the Board was required to comply with section 34-85 of the Code in terminating plaintiff Darreyl Young-Gibson and that she was entitled to be reinstated as principal at Julian. We deny plaintiff's motion to strike and we confirm the Board of Education of the City of Chicago's decision to remove plaintiff as principal at Julian.

¶ 63     Confirmed; motion denied.