# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Ball v. Board of Education of the City of Chicago, 2013 IL App (1st) 120136**

---

| | |
|---|---|
| Appellate Court Caption | VERA BALL, Plaintiff-Appellant, v. BOARD OF EDUCATION OF THE CITY OF CHICAGO; MARY RICHARDSON LOWRY, President; NORMAN BOBINS, TARIQ BUTT, PEGGY DAVIS, ROXANNE WARD, CLARE MUNANA and ALBERTO A. CARRERA, JR., Members; RON HUBERMAN, Chief Executive Officer; ELLEN ALEXANDER, Hearing Officer; and ILLINOIS STATE BOARD OF EDUCATION, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-12-0136 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | June 18, 2013<br><br>July 18, 2013<br>July 30, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A proper basis for plaintiff's dismissal from her teaching position existed where her failure to properly supervise her students resulted in them engaging in sexual activity in their school, especially when that conduct was immoral, negligent and irremediable *per se*. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-1021; the Hon. Peter Flynn, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Kurtis Hale, of Poltrock & Giampietro, of Chicago, for appellant. |
| | James L. Bebley and Lee Ann Lowder, both of Law Department of Board of Education of the City of Chicago, of Chicago, for appellees. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion. Justices Quinn and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1      This appeal is before this court following an administrative review proceeding concerning the December 15, 2010, decision of defendant Board of Education of the City of Chicago (Board) terminating plaintiff Vera Ball's employment with the Board as a tenured teacher assigned to Paul Revere Elementary School (Revere). Following an administrative hearing, the Board accepted in part and rejected in part the hearing officer's findings of fact, conclusions of law, and recommendation to reinstate Ball with a warning resolution. Ball sought administrative review in the circuit court of Cook County and on December 1, 2011, the trial court affirmed the Board's finding. This appeal followed.

¶ 2      Ball asserts on appeal that the Board erred in finding that she was negligent in breaching her duty to supervise her seventh- and eighth-grade students on May 26, 2009, when they engaged in sexual activity in the school. Ball also contends that the Board failed to prove that she caused any physical or psychological injury to the students. Finally, Ball asserts that the Board's decision to terminate her employment was arbitrary and capricious. For the following reasons, we affirm the decision of the Board.

¶ 3                             I. BACKGROUND

¶ 4      On September 9, 2009, pursuant to section 34-85 of the School Code (105 ILCS 5/34-85 (West 2010)), Chicago Public Schools (CPS) Chief Executive Officer Ron Huberman approved charges against plaintiff alleging conduct unbecoming a CPS employee and requested she be suspended, without pay, pending a dismissal hearing. The charges levied against plaintiff all related to events that took place at Revere on May 26, 2009, and the subsequent investigation of those events. Plaintiff was alleged to have violated numerous provisions of CPS' employee discipline and due process policy for negligently and intentionally failing to supervise her students and making false statements to investigators. A hearing officer was selected and a dismissal hearing was held, with two days of testimony in January 2010.

¶ 5    Ball had been a special education instructor for CPS since 1997 working with students with behavioral problems and learning disabilities at Revere and had no significant prior disciplinary history. Revere is a prekindergarten through eighth-grade elementary school located in the Grand Crossing neighborhood at 1010 East 72nd Street, Chicago, Illinois. The neighborhood was described as a high violence area with a high incidence of single-parent households, domestic violence, and drug and gang activity.

¶ 6    Approximately 400 students are enrolled at Revere, where 2 buildings comprise the closed campus and house 15 classrooms for the students. The school day at Revere runs from 9 a.m. to 2:45 p.m. with after-school activities after that. Because of the high gang activity in the area, students are required to wear uniforms to school. In addition, under the school policy, students are to be supervised at all times by teachers, including when in the hallways and on bathroom breaks. One security guard patrols both buildings, but security cameras are positioned throughout the school buildings and campus.

¶ 7    Veronica Thompson, principal for Revere, initiated a policy at the school when she started in 2005 called the "Three P's," which stands for permission, pass and partner. She testified that this stood for the requirement that any student not in a classroom and without a teacher had to have the teacher's permission, a pass, and a partner. At the beginning of the school year Thompson informed the teachers of their supervision responsibilities and reinforced that policy regularly in her weekly e-mail bulletins to staff. Thompson indicated in her bulletin that students should never be left unsupervised, particularly when in the halls and bathrooms. Teachers were required to escort their students to their "specials," noncore classes, and to and from the lunchroom. Teachers did not have a set lunch period but were granted two 10-minute breaks during the day. Ball took both her breaks during her students' lunch break from 10:54 to 11:16 a.m.

¶ 8    Ball's class during the 2008-09 school year met in Room 300 on the third floor and consisted of nine students of various abilities from fifth to eighth grade, including T.T., J.W., T.M. and L.A. K.B. was a 12-year-old female student in Ebonee Greene's classroom. Because of their disabilities and behavioral history, each of these students required greater supervision and Ball had a special education assistant, Willimer Hill, for her classroom. Hill's son was formerly a special education student at Revere and she volunteered there from 1997 to 2003 when she became a teacher's aide. In 2009, Hill's duties were to assist Ball by helping students with reading and math and by escorting students to other classrooms or the lunchroom during the school day.

¶ 9    On Sunday May 24, 2009, Thompson sent an e-mail to Ball and other teachers with the subject line reading "Urgent Summer School PD registration by 5/26." Thompson wrote "Please register for summer school PD [professional development] asap. If you don't attend both sessions, you will not be allowed to teach. Initial trainings are 6/2, 6/3 and 6/4. Follow-up sessions are 6/29 and 7/1." Thompson provided a website for registration as well as a telephone number for questions.

¶ 10    On Tuesday May 26, 2009, the school day began as normal. Ball testified that at approximately 10:54 a.m., she and Hill walked downstairs to the second floor with their students. Ball stated that she went into the disciplinarian office in Room 200 at

approximately 10:55 a.m. and Hill escorted the students to the lunchroom. While T.T. testified that Ball watched from the third-floor stairwell as the students went to the first-floor lunchroom, the video surveillance shows the students leave Room 300 unescorted at 10:52 a.m., Hill and Ball leave Room 300 at 10:53 and the students reach the first floor seconds later, and then at 10:54 it shows Ball enter Room 200 and Hill continue to the first floor to escort the students to the lunchroom.

¶ 11    Room 200 was where a phone was located that teachers could utilize if they needed to make calls during the school day. Ball attempted to register for her professional development courses at this time. Hill returned to Room 200 during the lunch break, then went back to the lunchroom. At 11:17 a.m., Hill brought the students to Room 200. The students remained with Ball and Hill in Room 200 for the next 30 minutes doing nothing while Ball continued to attempt to register for her classes. Ball granted permission to the children to use the washroom and Hill stood in the doorway while some students paired up to use the washrooms.

¶ 12    On the way to the washroom, T.T. and L.A. met up with K.B. from Greene's class and they went into the copy room. T.T. testified that K.B. and L.A. went into a closet in the room and he saw K.B. engaged in oral sex with L.A. The three then left the copy room and returned to their classes unescorted. Hill escorted the class from Room 200 back to Room 300 between 11:45 a.m. and 11:50 a.m. At approximately noon, Ball returned to Room 300 to rejoin the class.

¶ 13    Ball stated that she conducted regular classroom activities with the students from noon until approximately 2 p.m. Shortly before 2 p.m., Ball had her students begin cleaning the classroom in preparation for the seventh and eighth graders to go to their special, computer class, to end the day. A pair of students was given a pass to go to the office and pick up some fliers and another pair, T.M. and T.T., were granted permission to clean the turtle tank. Ball stated that she then asked Hill to take the seventh and eighth graders to specials. Ball testified that she continued to try and register for professional development while the two remaining students continued to clean the classroom at around 2:05 p.m.

¶ 14    However, Hill testified that Ball was not in the classroom at any time after lunch until approximately 2 when she returned and told the older students to go to their lockers and specials. Hill claimed that R.H. came in and said that J.W. and others had left so Hill informed Ball that she needed to tell the kids to come back, but Ball told her that they had gone to specials and did nothing. Hill testified that Ball did not instruct her to escort the kids at this time and that both she and Ball stayed in the classroom until the end of the school day.

¶ 15    T.T. testified that the students did not have an escort to computer class on May 26, 2009, and stated that they were not always escorted. He testified, and the surveillance cameras also indicate, that the students met up with K.B. in the hallway at this time. T.T., J.W., and T.M. were playing around in the hallway when K.B. invited them to go to the auditorium. At 2:14 p.m. T.T. went to the computer lab on the second floor but the substitute teacher did not see him, so he turned around and went to the auditorium. At 2:18 p.m., the three boys can be seen going into the auditorium. In the auditorium, K.B. engaged in oral sex with T.M. and vaginal intercourse with T.T.

¶ 16    Yolanda Davis, site coordinator for the after-school program, went to the auditorium at around 2:25 p.m. on May 26, 2009, to see if the custodial staff had cleared the area for the after-school ballet club. When she went into the auditorium, she heard a noise and heard people run out of the back door of the stage area when she asked who was there. She went up to the stage and found K.B. on the floor of the stage, naked from the waist down. Davis had K.B. get her pants on while she called security and then took K.B. to Thompson's office.

¶ 17    K.B. first stated that the boys forced her to have sex with them, but later admitted that it was consensual. Her mother was called into the office and K.B. was transported to the hospital by ambulance before the police arrived. The boys involved were then called into Thompson's office and questioned.

¶ 18    Ball left for the day at 2:55 p.m. When she clocked out at the office, Jacqueline Cheatham, the assistant principal, was at the counter of the office and said something about Ball's boys being into something. Ball testified that Cheatham was smirking when she addressed her and Ball responded that it had been a long day, she did not know, and did not want to know.

¶ 19    On May 27, 2009, Ball was called to a meeting in Thompson's office early in the day with the students that were involved, the students' parents, and Ebonee Greene. J.W. did not talk other than to admit he only watched. T.M. denied any involvement before admitting that he had oral sex with K.B. T.T. admitted that he had consensual sex with K.B. and also offered that K.B. had given L.A. "some head" earlier in the day and that he witnessed it in the copy room.

¶ 20    Raymond Poloko, an investigator for the Board, testified that Ball informed him that either she or Hill always escorted the students to specials. She claimed that Hill escorted the students on May 26, 2009. He also testified that he interviewed Hill, who told him that Ball was lying. Hill claimed that Ball almost never escorted the students, but would just let them leave the classroom, only sometimes walking to the stairwell to watch them go to the second floor. Poloko concluded that Ball was negligent on May 26, 2009.

¶ 21    The hearing officer found the video footage supported the testimony that Ball's students went to the cafeteria unescorted at 10:52 a.m. while Ball and Hill went to Room 200. At 11:24 students reported to Room 200 where Ball remained until 11:48. During this time T.T., K.B. and other students were unsupervised in the hallway. They went into the copy room during this time where the first incident of sexual activity occurred. The hearing officer found this 30- to 45-minute period where Ball attempted to register for her professional development class and did not teach or supervise her students closely constituted pedagogical negligence. She opined that this was not a pattern of reckless behavior, but a moment of carelessness and neglect.

¶ 22    The hearing officer also found that Ball knowingly violated the school's internal policy of constant supervision for failing to escort the students to the computer room around 2 p.m. She opined that Ball "was negligent, but neither grossly negligent nor reckless in allowing her students to go by themselves down a flight of stairs to their next class. It was wrong, but it was also able to be addressed or 'corrected by a warning.' " Therefore, while the Board proved its charges that Ball made a false statement to the investigator, failed to comply with

the safety rules of the school, and violated school rules in a way that seriously disrupted the educational process in the school, she found the students' sexual behavior was not a foreseeable and direct result of Ball's actions and the school community's and K.B.'s reputations were not irretrievably damaged. She recommended Ball be reinstated and placed in a warning performance status.

¶ 23    The Board found that Ball's statements to the investigator that she or Hill also escorted the students to computer lab were false and adopted the hearing officer's finding on that allegation, as well as her other two findings of violations. The Board opined that Ball's attempt to register for her professional development class while the students sat idle was unprofessional and unsatisfactory. Had Ball not knowingly violated rules and abandoned her post, the Board concluded, the students would not have had the opportunity to undertake the sexual activities. The Board rejected the conclusion that the students were only potentially psychologically harmed as the boys were initially charged with rape and questioned by the administrators, parents and police. In addition, K.B. never returned to Revere.

¶ 24    The Board found Ball's comments to Cheatham were emblematic of a lax work ethic that was unacceptable, harmful and irremediable. The Board disagreed with the hearing officer's conclusion that this was simply a single day of carelessness. Taking notice that Greene, K.B.'s teacher, was also discharged, it held both Ball and Greene equally accountable for the incident. The Board found Ball's neglect, indifference and dishonesty required her dismissal as it was "loathe to risk the safety and well-being of students on the hope that this was Ball's 'one day of carelessness and neglect.' " Accordingly, the Board terminated Ball's employment pursuant to section 34-85 of the School Code.

¶ 25    Ball filed a complaint in administrative review with the circuit court of Cook County. Following briefing and a hearing, that court affirmed the Board's decision and Ball's dismissal. This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27    Under the Administrative Review Law, we review the decision of the Board, not that of the circuit court. *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 162 (2006); 735 ILCS 5/3-101 *et seq.* (West 2010). Factual determinations by an administrative agency are held to be *prima facie* true and correct and will stand unless contrary to the manifest weight of the evidence. 735 ILCS 5/3-110 (West 2010); *Bloomington Public Schools, District No. 87 v. Illinois Property Tax Appeal Board*, 379 Ill. App. 3d 387, 390 (2008). However, questions of law are subject to *de novo* review. *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 479 (2008). An agency's findings of fact will be held against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Further, regardless of the basis or reasoning provided by an agency for its decision, we may affirm the agency's decision on any basis appearing in the record. *Ahmad*, 365 Ill. App. 3d at 162.

¶ 28    Section 34-85 reads, in pertinent part: "No written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or which in

any way causes psychological or physical harm or injury to a student as that conduct is deemed to be irremediable." 105 ILCS 5/34-85 (West 2010). Activity that is cruel, immoral, negligent or criminal is irremediable *per se*. *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d 522, 534 (2003). This type of behavior "demonstrate[s] a basic character flaw which makes [a teacher's] future employment at the Board of Education, which is partially responsible for molding the character of our youth, untenable" and "dismissal [is] entirely appropriate." *Ahmad*, 365 Ill. App. 3d at 167.

¶ 29    In *Younge*, plaintiff teachers were terminated for separate incidents of being under the influence of marijuana while at work. *Younge*, 338 Ill. App. 3d at 524-29. The *Younge* court highlighted the 1995 amendments to section 34-85 that provided that cruel, immoral, negligent or criminal behavior was irremediable *per se* and no proof of damage from such an action was necessary to support termination. *Id.* at 533-34. The hearing officers and the Board found that the teachers, one who admitted the use of marijuana and one who did not, "violated several of the Board's rules and policies, but also constituted immoral conduct" and their dismissal without written warning or progressive discipline was appropriate. *Id.* at 534.

¶ 30    The facts of *Ahmad* are more similar to the instant scenario. In *Ahmad*, plaintiff teacher misrepresented herself as an agent of CPS in order to obtain free goods from a company while also concealing her actions from CPS. As a result, she obtained shipments of goods valued over $30,000, sold that merchandise under a private venture, and did not pay the bill. *Ahmad*, 365 Ill. App. 3d at 157-60. The *Ahmad* court found the plaintiff's intentional acts of dishonesty for personal gain was immoral conduct and supported termination under section 34-85. *Id.* at 164-65.

¶ 31    In the instant matter, the Board concluded that Ball's dishonesty, indifference and negligent actions warranted her dismissal. The hearing officer and Board both found that Ball made false and deliberately inaccurate statements to the investigator. The Board notes that Ball has not contested this finding.

¶ 32    The testimony and evidence show that Ball tended to her personal need to register for professional development classes during the first incident while some students sat idle in the room with her and others snuck off when on a bathroom pass and engaged in sexual acts with another student. It also shows that Ball's students were not escorted to the computer lab around 2 p.m. Ball lied to the investigator about the fact her students were always escorted to class and that they were escorted on this day. Allowing the children to go unescorted through the school violated school policy and was negligent oversight compounded by Ball's tending to personal needs instead of properly overseeing her special education students.

¶ 33    Ball argues that, unlike *Ahmad*, there was no fraud or personal gain. She claims that there was no showing that her untruthfulness to the investigator was intended to mislead the Board or damage the investigation. She contends that the Board's argument that lying is immoral conduct is not supported. Ball points to the Board policy and notes that its policy does not require dismissal for making false statements to investigators. This argument is specious; Ball does not dispute that she made false statements to the investigator and those statements could only be made in her attempt to personally gain by avoiding responsibility for her negligent acts. Furthermore, as stated in *Younge*, even where the Board's policy provides for

-7-

a different penalty, the School Code provides that dismissal is proper for such immoral action.

¶ 34    Ball's additional arguments also fail. First, Ball admits that she waived her argument that the Board failed to prove her guilty of negligence as she did not advance that argument before the hearing officer or Board, but contends this court should consider this argument as waiver is a limitation on the parties, not this court. *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 480 (1991). We agree that this argument was waived, and even if not waived, Ball's argument improperly applies the elements for the tort of negligence, not a determination in a disciplinary action for negligent acts. As the *Younge* court identified, a specific harm from the teacher's behavior need not be shown to support dismissal under section 34-85.

¶ 35    Ball's attempts to demonstrate the Board's decision was arbitrary and capricious also fail. Ball asserts that the Board failed to recognize that the substitute computer teacher, Mr. Armstrong, or her assistant, Ms. Hill, failed to properly supervise students involved in this incident and they were not disciplined. She claims that the evidence showed that she told Hill to escort the children and that Armstrong failed to take attendance or notice when T.T. opened the door to the classroom, but then left to the auditorium, and that the Board ignored the testimony placing responsibility on the substitute teacher, Mr. Armstrong. As the Board found, Ball had primary responsibility as the teacher and the evidence showed that she failed to properly supervise the children and lied about that. It was not arbitrary and capricious not to place the blame on the other staff members.

¶ 36    Finally, it was not arbitrary and capricious to reject the hearing officer's finding without consultation. *Hearne v. Chicago School Reform Board of Trustees of the Board of Education for the City of Chicago*, 322 Ill. App. 3d 467, 484 (2001). Unlike *Hearne*, credibility is not the determining factor and the Board did not produce a half-page decision with conclusory findings. *Id.* Rather, the Board produced an extensive and well-reasoned decision, cited to testimony and video evidence in support of its conclusion, and even agreed with several of the hearing officer's conclusions. The Board added some fact discussion and presented reasoning for rejecting the hearing officer's conclusion that Ball conceivably could have thought the children were properly escorted and was not reckless or grossly negligent. The Board's thoughtful analysis of the facts and the law did not violate Ball's due process rights under *Hearne*. Accordingly, we agree with the Board that Ball's actions were immoral and negligent and, therefore, irremediable *per se* and a proper basis for her dismissal under *Younge* and *Ahmad* and we affirm the final decision and order of the Board.

¶ 37                                 III. CONCLUSION

¶ 38    For the foregoing reasons, the decision and order of the Board is affirmed.

¶ 39    Affirmed.