# Illinois Official Reports

## Appellate Court

*Crawley v. Board of Education of the City of Chicago*, 2019 IL App (1st) 181367

| | |
|---|---|
| Appellate Court Caption | DOROTHY CRAWLEY, Petitioner, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO; JANICE JACKSON, Chief Executive Officer; LAWRENCE COHEN, Hearing Officer; and THE ILLINOIS STATE BOARD OF EDUCATION, Respondents. |
| District & No. | First District, Sixth Division<br>Docket No. 1-18-1367 |
| Filed | May 10, 2019 |
| Decision Under Review | Petition for review of order of Board of Education of the City of Chicago, No. 18-0523-RS2. |
| Judgment | Affirmed in part and dismissed in part. |
| Counsel on Appeal | Kurtis Hale and Jennifer Poltrock, of Poltrock & Poltrock, of Chicago, for petitioner.<br><br>Joseph T. Moriary, Susan E. Galán, and Lee Ann Lowder, of Chicago, for respondents the Board of Education of the City of Chicago and Janice Jackson.<br><br>No brief filed for other respondents. |

PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.

Justices Harris concurred in the judgment and opinion.

Justice Connors concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1      After a hearing, the respondent, the Board of Education of the City of Chicago (Board) dismissed the petitioner, Dorothy Crawley, from her position as an elementary school teacher. The Board determined that Crawley falsely characterized certain days for which she was absent from work as "sick days" although she was not, in fact, sick. Crawley seeks administrative review of that decision, arguing that the Board wrongfully terminated her. We affirm the Board's order and dismiss the hearing officer as a respondent to the petition for administrative review.

¶ 2                                    BACKGROUND

¶ 3      On February 10, 2017, the Board's chief executive officer approved eight charges against Crowley, alleging that she (1) had a consistent or patterned record of absenteeism, (2) failed to perform her duties, (3) failed to follow Board personnel rules, (4) intentionally made false representations in her employment record, (5) violated an employee manual provision requiring that sick days be used "during the employee's personal illness or serious illness in the immediate family or household," (6) violated the Illinois State Board of Education (State Board) code of ethics, (7) violated State Board teaching standards, and (8) exhibited conduct unbecoming a Board employee. The Board cited specific rules applicable to each charge. The charging document also contains five "specifications" relating to the eight charges as a whole: (1) Crawley was a tenured teacher at Wells Preparatory Elementary School (Wells), (2) she falsified her time off on October 22 and October 23, 2015, by using sick days while attending a "pre-planned vacation on a Caribbean cruise," (3) she falsified her time off on May 20, 2016, by using a sick day to drive to New York, (4) she falsified her time off on June 6 through June 13, 2016 (a total of five school days), by travelling to Norway, and (5) this conduct was unbecoming of a Board employee. The conclusion of the charges stated that "dismissal is warranted due to your irremediable conduct" and that dismissal "may result in your permanent ineligibility for future employment with the Board."

¶ 4      Crawley's union requested a hearing on the charges before a mutually selected hearing officer pursuant to section 34-85 of the School Code (105 ILCS 5/34-85 (West 2016)). The parties selected Lawrence Cohen as the hearing officer. Crawley filed an answer to the charges denying all the allegations and specifications, except the specification that she was a tenured teacher at Wells. Her answer included six affirmative defenses, of which the following are relevant to this appeal: (1) Crawley had communicated the reasons for her time off to the administration, (2) she had a legitimate diagnosed medical condition requiring time off, and (3) her conduct was reasonable.

¶ 5      At the hearing, an investigator for the Board's inspector general testified that her office received an anonymous complaint that Crawley was using sick time to take a cruise. She conducted an investigation that included a review of Crawley's time records and Facebook

posts and interviews with Crawley and coworkers. During the investigation, Crawley justified her use of time off by explaining, among other things, "she needed to get away" due to workplace altercations. However, Crawley did not produce medical documentation supporting any particular illness that occurred at the time of the sick days in question.

¶ 6 Various Board staff members explained they understood that, under Board policies and rules, sick time could not be used for vacations and that a teacher can take an unpaid "zero day" if she has used other available time off. A teacher is given about 12 sick days in a school year for use because of a personal or qualifying family member's illness. The teacher is also given 10 vacation days to be used during school recess periods, and three "personal business" days. At the hearing, Crawley's time records and Board rules, which provided that sick time should only be used when a teacher is sick, were admitted into evidence. By October 15 in the 2015-16 school year, Crawley had already used up her allotted personal business days. Wells principal Jeffrey White testified that 100% of the students at Wells qualify for free or reduced-price lunches because of their families' low incomes. He stated that a teacher's absence is especially detrimental to students with disabilities, including those in Crawley's assigned classroom. Crawley never told White that she had any disability requiring special time off, and he did not approve any of the sick time at issue for the purpose of travel or vacation.

¶ 7 Crawley conceded that she traveled to the destinations listed on the dates detailed in the charges and specifications. The May 20, 2016, trip was to drive her cousin back to a school in New York. She also testified that she had told her principal she was going to Norway with her church group, but she did not say when she would travel there. She testified that she received a knee scope treatment at the Mayo Clinic in Rochester, Minnesota, on October 22 and 23, 2015, dates which fell immediately before she drove back to Chicago from Minnesota and went on a cruise. She stated that she took sick days for the two-day Mayo Clinic visit and personal days for the cruise.

¶ 8 Crowley admitted to having received the Board sick leave policy and signing to acknowledge it. She submitted a physician's note stating that she needed time off to deal with stress, but the note was dated just a few days after the Board brought the charges, and she did not reveal this medical condition during the inspector general's investigation. She also presented the testimony of a fellow Wells employee who stated he was never advised about any restrictions on sick day use.

¶ 9 On April 18, 2018, Cohen issued written findings of fact and a recommendation. He acknowledged that the Board disputed the veracity of Crowley's testimony regarding the Mayo Clinic visit because it was contradicted by other evidence generated during the Board's investigation and Crowley's interrogatory responses. He found that he did not have to resolve the conflict with respect to the October sick days, however, because the evidence of misuse of the other sick days was uncontroverted. He found that because Crawley did not contest that she used sick days to go on vacation when she was not sick, the only issue to be decided was whether that violation was "irremediable *per se* so as to obviate the need for a prior warning." He found that neither Crawley's cooperation with the Board's investigation nor her belief that her use of sick time complied with Board policy were valid defenses to the charges. As to the latter defense, he found that Crawley admitted that she was familiar with the sick leave policy and that her asserted belief that sick days could be used for other purposes made "no sense" since teachers were given other categories of time off for specific purposes. Cohen found that Crawley gained a financial advantage because she took paid sick time rather than unpaid "zero

time" for her out-of-town trips and that her conduct was "a theft of Board resources and damage to the Board" because the Board was required to pay substitute teachers to cover classrooms on Crawley's sick days. Further, he found, not having the regular teacher in the classroom on those days adversely impacted students, particularly those with special education needs. In sum, he found her conduct to be irremediable because it was " 'negligent' " and " 'immoral' " under section 34-85 of the School Code.

¶ 10    On May 23, 2018, the Board adopted a resolution reciting that it had considered Cohen's findings of fact, conclusions of law, and recommendation; the record; and the parties' briefs. The resolution further stated that the Board accepted Cohen's "findings of fact and legal conclusions and finds sufficient grounds for the discharge of Ms. Crawley." This petition for direct administrative review followed.

¶ 11                                    ANALYSIS

¶ 12    A public schoolteacher dismissed by the Board may seek direct review in this court "in accordance with the Administrative Review Law." 105 ILCS 5/34-85(a)(8) (West 2016). The standard for judicial review of administrative decisions, such as the Board's orders of termination here, is well established. In administrative review cases, we do not review the decision of the hearing officer; rather, we review the decision of the Board. *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 162 (2006); *Hearne v. Chicago School Reform Board of Trustees of the Board of Education for the City of Chicago*, 322 Ill. App. 3d 467, 478 (2001).

¶ 13    A tenured Chicago public schoolteacher cannot be fired except "for cause." 105 ILCS 5/34-85(a) (West 2016). Tenured teachers generally must be given a written warning before dismissal proceedings are instituted. *Id.* Failure to comply with the written warning can justify dismissal. See *id.*; *Prato v. Vallas*, 331 Ill. App. 3d. 852, 862 (2002).

¶ 14    However, section 34-85(a) of the School Code characterizes certain conduct as "irremediable." No warning need be given before taking adverse action against an employee who engages in irremediable conduct. Historically, courts have used a two-part test to determine whether a teacher's conduct supporting a dismissal was remediable or irremediable. See *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143, 153 (1977). Under that test, a court reviews (1) whether the teacher's conduct caused significant damage to students, faculty, or the school and (2) whether the teacher would not have corrected his conduct, even if he had been issued a written warning and a period of time for remediation. *Id.* In 1995, however, the School Code was amended by Public Act 89-15 (Pub. Act 89-15, § 5 (eff. May 30, 1995) (amending 105 ILCS 5/34-85)) to include the language in section 34-85 that explicitly provides that certain types of conduct are to be deemed *per se* irremediable, thereby abrogating *Gilliland* in some circumstances and eliminating the need to apply its test to certain types of conduct. *Ahmad*, 365 Ill. App. 3d at 164; *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d 522, 533 (2003).

¶ 15    Section 34-85(a) reads, in pertinent part: "No written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student, as that conduct is deemed to be irremediable." 105 ILCS 5/34-85(a) (West 2016). This court has explained section 34-85 in the following terms:

- 4 -

"Where, as here, a statute does not define a term, we will assign such a term its ordinary and commonly understood meaning and may use a dictionary for this endeavor. [Citation.] Here, the Code does not define immoral conduct. Immoral conduct has been defined as 'shameless' conduct showing 'moral indifference to the opinions of the good and respectable members of the community.' [Citation.] Applying this definition to the present case, we find that the record reveals an abundance of evidence demonstrating plaintiff engaged in conduct one might properly characterize as immoral, perhaps even criminal, *i.e.*, theft by deception." *Ahmad*, 365 Ill. App. 3d at 165.

¶ 16 The *Ahmad* court further explained: "where teachers indulge in conduct that is immoral at best, and criminal or quasi-criminal at worst, they demonstrate a basic character flaw which makes their future employment at the Board of Education, which is partially responsible for molding the character of our youth, untenable." *Id.* at 166-67.

¶ 17 Whether a cause for dismissal is irremediable is a question of fact. *Szabo v. Board of Education of Community Consolidated School District 54*, 117 Ill. App. 3d 869, 872 (1983). The findings and conclusions of the Board on questions of fact are held to be *prima facie* true and correct, and no new or additional evidence on the points at issue may be considered. 735 ILCS 5/3-110 (West 2016). We do not reweigh evidence nor make an independent determination of the facts. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386 (2010). "When an administrative agency's factual findings are contested, the court will only ascertain whether such findings of fact are against the manifest weight of the evidence." *Id.* at 386-87. Factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998)).

¶ 18 Here, we cannot say that the Board's decision that Crawley's conduct was irremediable was against the manifest weight of the evidence. The evidence demonstrated that after using up other available time off, Crawley misused an aggregate of eight sick days spread over three periods. Two of these times, she went out of town on vacation, the third time, she traveled to New York for personal reasons. Principal White testified that during these times, the Board was required to hire a substitute, essentially paying twice for a single day of teaching time. Additionally, when Crawley was off, her students were damaged because their lesson plans and pedagogical continuity were disrupted. This repeated misuse of sick time constituted irremediable conduct and cause for termination under section 34-85 of the School Code. The Board's decision to terminate Crawley for this conduct was not against the manifest weight of the evidence.

¶ 19 Crawley's reliance on cases issued before the 1996 School Code amendment is unavailing because these cases did not interpret the definition of irremediable conduct now contained in section 34-85 of the School Code. See, *e.g.*, *Board of Education of Round Lake Area Schools v. State Board of Education*, 292 Ill. App. 3d 101, 112 (1997) (teacher's conduct in taking unapproved vacation time was not irremediable under the *Gilliland* test); *Szabo*, 117 Ill. App. 3d at 873 (teacher's conduct in taking personal and sick days to coach a community college soccer team was not irremediable under the *Gilliland* test because it could be rectified upon proper warning and notice). Crawley also relies on *Board of Education of Joliet Township High School District No. 204 v. Illinois State Board of Education*, 331 Ill. App. 3d 131, 136

(2002), in which the court found that although a teacher's misuse of sick days to attend a professional conference was "not laudable and not the best example for students," her conduct was remediable. However, unlike here, the *Joliet* court was not called upon to interpret section 34-85 of the School Code, which governs Chicago schoolteachers and specifically defines irremediable conduct. Instead, the court applied the traditional *Gilliland* test and various provisions of article 24 of the School Code, which did not define irremediable conduct in the same manner as section 34-85 of the School Code. See *id.* at 134. Therefore, *Joliet* does not affect our analysis. In fact, it appears that the legislature may have enacted the new irremediability standards in section 34-85 of the School Code to partially abrogate the line of cases upon which Crawley relies.

¶ 20 Likewise, we are unconvinced by Crawley's argument that the Board blindsided her by firing her for "theft" when neither the charges nor the specifications raised "theft" as a basis for dismissal. The hearing officer's recommendations, which the Board adopted, stated, in part, that "[h]er misconduct also results [*sic*] a theft of Board resources and damage to the Board" because of the "monetary loss resulting from the need to employ substitute teachers." It is clear from the record that the "theft" was merely a colloquial characterization of the result of Crawley's use of sick time in a manner that required the Board to pay twice for a single day of teaching. As such, it was not a new charge. Additionally, the hearing officer's statement regarding theft must be taken in the context of the lengthy and detailed explanation he gave of why Crawley's misconduct was irremediable and warranted her termination.

¶ 21 Finally, we address Crawley's naming hearing officer Cohen as a party to her petition for administrative review. Although the Board does not raise the issue, and Cohen himself has not appeared, we note that the improper practice of naming administrative hearing officers as parties to administrative review cases occurs with disturbing frequency. See, *e.g.*, *Ball v. Board of Education of the City of Chicago*, 2013 IL App (1st) 120136 (naming hearing officer Ellen Alexander as a defendant); *Younge*, 338 Ill. App. 3d at 529 (naming hearing officer Edward L. Suntrup). Under the School Code, the hearing officer assigned in this case had the power to hear testimony, admit exhibits, and render a recommended decision to the Board, which itself was the ultimate decision-making authority. See 105 ILCS 5/34-85(a)(5) (West 2016); 23 Ill. Adm. Code 51.60, 51.75 (2012). As such, the hearing officer is much like a circuit court judge whose decision is appealed to an appellate court. The circuit court judge is not a party to the appeal; only the actual litigants are. The same holds true for a hearing officer. The Board, as the ultimate decision-making authority, is a proper party to the petition for administrative review. So is the Board's chief executive officer because her predecessor brought the dismissal charges against Crawley. See 735 ILCS 5/3-113(b) (West 2016) (in a direct administrative review action in the appellate court, "[t]he administrative agency and all persons, other than the petitioner, who were parties of record to the proceedings before the administrative agency shall be made respondents"). Since Cohen is neither an administrative agency nor a party of record, he was not a proper party to the petition. We therefore dismiss Cohen as a respondent to the petition for administrative review.

CONCLUSION

¶ 23 We affirm the Board's decision to terminate Crawley but dismiss Cohen as a respondent to this proceeding.

¶ 24 Affirmed in part and dismissed in part.

¶ 25 JUSTICE CONNORS, concurring in part and dissenting in part:

¶ 26 I concur with the majority's decision to dismiss Hearing Officer Cohen as a party to this appeal, but I respectfully dissent from the majority's decision to affirm the Board's termination of Crawley.

¶ 27 Here, the Board terminated Crawley after accepting the hearing officer's finding that she had engaged in conduct that was irremediable *per se*. This determination was against the manifest weight of the evidence. As the majority recognizes, section 34-85(a) of the School Code provides: "No written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student, as that conduct is deemed to be irremediable." 105 ILCS 5/34-85(a) (West 2016). The majority also recognizes that immoral conduct, although not defined in the code "has been defined as 'shameless' conduct showing 'moral indifference to the opinions of the good and respectable members of the community.' [Citation.]" *Ahmad*, 365 Ill. App. 3d at 165. Thus, the majority's holding implies that misuse of sick days is "shameless" conduct that shows a moral indifference to the opinions of good and respectable people. Such a conclusion does not comport with existing law.

¶ 28 The hearing officer's report, which contained findings of fact and conclusions of law that were accepted by the Board, stated that "[t]he only issue to be decided is whether [Crawley's use of sick days when she was not sick] was irremediable *per se* so as to obviate the need for a prior warning." In resolving that issue, the hearing officer's report cited two previous decisions from hearing officer Weiland and one of his own previous decisions: "*Hicks v. Bd. of Ed. of City of Chicago* (Weiland 2012)"; "*Bd. of Ed. of the City of Chicago and Mark Kelley* (2017)"; and "*Bd. of Ed[.] of the City of Chicago and Lori Neren*[1] (Weiland 2017)." The report's discussion section contained only a brief reference to this court's decision in *Ahmad* and no other citation to appellate or supreme court cases. It is curious that the hearing officer relied on previous hearing officer decisions that he was not bound by when there are numerous decisions from this court that are applicable to the issues in this case. *Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board*, 2015 IL App (4th) 140557, ¶ 51 ("While administrative agencies are bound to follow their own administrative rules, they are not absolutely bound by their prior rulings."). Further, it is unclear whether the findings and recommendations of the hearing officers in *Hicks*, *Kelley*, and *Neren* were ever adopted by the Board in those cases. This is significant because a court of review does not review the decision of the hearing officer and instead reviews the decision of the Board. *Ahmad*, 365 Ill. App. 3d at 162. Thus, if the hearing officer's decisions in those cases were not ever adopted by the Board, then the hearing officer's recommendations would have little value. Regardless,

---

[1]We note that in the hearing officer's report, the surname in the title of one of the decisions upon which he relied is spelled as both "*Naren*" and "*Neren*." We are unsure which is correct but refer to the case as "*Neren*" because that is the spelling used most frequently in the report.

in this case, the Board only adopted the hearing officer's findings of fact and conclusions of law. It did not accept the hearing officer's analysis or reliance upon certain prior hearing officer decisions. Further, hearing officer decisions have no precedential value on this court, and it is preferable to instead look to decisions from this court and our supreme court for guidance.

¶ 29 This court has specifically considered the misuse of sick days in *Joliet*, 331 Ill. App. 3d 131. In that case, the hearing officer had found that the teacher's misuse of sick days, *i.e.*, using sick days to attend a professional conference, was remediable and not against public policy, and this court affirmed. *Id.* at 133. This court disagreed with the Board that the teacher's conduct constituted "shocking and immoral conduct." *Id.* at 134. The court found that the hearing officer correctly determined that the teacher's conduct was remediable because although misuse of sick days was "hardly exemplary behavior," it was "not so odious that the court can dispense with a finding that it could not have been corrected with a warning." *Id.* at 135. The court explained that the teacher had testified that she would not have used her sick days to attend a conference if she had been warned of the consequences and she had been led to believe that using a sick day for such a purpose would not be a serious offense. *Id.* at 136. The court also explained that to agree with the Board's contention that a teacher's absences amounted to a theft of public funds was " 'overly harsh.' " *Id.* (quoting *Szabo*, 117 Ill. App. 3d at 875).

¶ 30 Here, the evidence demonstrated that after using up other time off, Crawley misused an aggregate of nine sick days spread over three time periods. Contrary to the Board's contentions, this is not "immoral" conduct. Although the administrative agency in *Joliet* did not make a finding that the teacher's conduct was irremediable *per se*, on review, this court specifically stated that it disagreed with the Board's contention that the teacher's conduct of misusing sick days was "shocking and immoral." *Id.* at 134. The majority attempts to distinguish *Joliet* from the instant case and points out that, there, the court did not examine section 34-85 of the School Code, "which governs Chicago schoolteachers and specifically defines irremediable conduct." *Supra* ¶ 19. I disagree with this distinction because in *Joliet* the court was faced with determining whether the misuse of sick days was "shocking and immoral" conduct, and thus, irremediable, and here, the issue is similarly whether Crawley's conduct was immoral, *i.e.*, shameful or showing moral indifference to the opinions of good people and thus irremediable *per se*.

¶ 31 Further, in this case, the hearing officer's report, which contained findings of fact and conclusions of law that were accepted by the Board, found that:

> "[Crawley's] misconduct resulted [in] a theft of Board resources and damages to the Board: the monetary loss resulting from the need to employ substitute teachers; the inability of the Board to find a substitute on some of the days of Crawley's absence with its resultant adverse effect on her students; the impact of a teacher's absence on those students with individualized education plans; and the other negative consequences of an absence on what White termed 'the culture and climate of the school.' "

¶ 32 Such a conclusion is against the manifest weight of the evidence. First, as discussed later in this partial dissent, White did not testify as to any actual costs or damage incurred as a result of Crawley's absence. Second, in *Joliet*, the court explicitly recognized that classifying a teacher's absence due to the misuse of sick days as theft is " 'overly harsh.' " *Joliet*, 331 Ill. App. 3d at 136 (quoting *Szabo*, 117 Ill. App. 3d at 875). The majority refers to the Board's

characterization of Crawley's conduct as theft as "merely a colloquial characterization of the result of Crawley's use of sick time in a manner that required the Board to pay twice for a single day of teaching." *Supra* ¶ 20. This is problematic because not only has this court already deemed such a label overly harsh, there is no evidence that the Board, in fact, paid twice for a single day of teaching as the majority suggests.

¶ 33 Further, in a more recent case, *Jackson v. Board of Education of the City of Chicago*, 2016 IL App (1st) 141388, ¶¶ 45-48, this court determined that when a teacher falsified his employment application and failed to report test cheating, his conduct was not immoral and thus not irremediable *per se*. Additionally, numerous other cases decided after the School Code was amended have found a teacher's conduct to be irremediable *per se* when some form of criminal conduct was involved, and in cases where the conduct was deemed "immoral," the circumstances were far more extreme than misuse of sick days. See, *e.g.*, *Ball v. Board of Education of the City of Chicago*, 2013 IL App (1st) 120136, ¶¶ 31-32 (teacher engaged in immoral and negligent conduct deemed irremediable *per se* where she failed to supervise special needs students, enabling students to engage in sexual activity on school property, and where she gave false statements to investigators); *Jones v. Board of Education of the City of Chicago*, 2013 IL App (1st) 122437, ¶ 19 (teacher engaged in immoral conduct deemed irremediable *per se* where she fraudulently enrolled her nonresident children in city school so they could receive tuition-free educations); *Ahmad*, 365 Ill. App. 3d at 165-67 (teacher engaged in criminal and immoral conduct deemed irremediable *per se* where she misappropriated merchandise of nonprofit organization by falsely representing herself as an agent of the city's public schools); *Younge*, 338 Ill. App. 3d at 534 (teacher who reported to work under the influence of marijuana, an illegal drug, engaged in criminal and immoral conduct deemed irremediable *per se*).

¶ 34 Compared to the foregoing cases, the misuse of sick days in this case, although certainly lacking good judgment, did not rise to the level of immoral conduct that would merit the termination of a tenured teacher's employment without a warning. Crawley asserts that the Board should have found her conduct to be remediable under the *Gilliland* test and her contention is well-received. Conversely, the Board asserts that even under *Gilliland*, Crawley's misconduct is irremediable because the Board clearly articulated its restrictions on sick leave. Such an argument is unconvincing.

¶ 35 Under *Gilliland*, a court must look to (1) whether the teacher's conduct caused significant damage to students, faculty, or the school and (2) whether the teacher would not have corrected her conduct, even if she had been issued a written warning and a period of time for remediation. *Gilliland*, 67 Ill. 2d at 153. As to the first prong, in order for "conduct to be considered irremediable, the damage caused by that conduct must have been 'significant.' " *Prato*, 331 Ill. App. 3d at 862 (quoting *Board of Education of the City of Chicago v. Illinois State Board of Education*, 160 Ill. App. 3d 769, 776 (1987)).

¶ 36 Here, there is no evidence that Crawley's conduct caused significant damage to the students, faculty, or the school. The hearing officer's report contained the finding that Crawley's conduct resulted in a theft to the Board due to its need to employ substitute teachers. However, Principal White did not specifically testify whether substitutes were obtained during Crawley's absences, and if they were, what the actual cost to the school for substitutes was. Additionally, Lucesita Ortiz, the recruitment team leader who also testified at the hearing, stated that although Crawley requested substitute teachers for the days she was going to be

absent, there were some days on which substitutes were not available. When asked what the impact of an absent teacher is, Principal White responded, "The direct impact affects the culture and climate of the school. It is my belief that a substitute teacher is in essence Subway food sandwiches for the kids. She's a sub in for the day, it's almost like it's going to be a free day." He further testified that from a fiscal standpoint, "the direct cost is employing a substitute teacher" and that, if he did not have a substitute, "I have to ask one of the aides or another teacher to give up their prep, which I have to make up so they can cover the class." Although Principal White testified that hypothetically damage occurs, he did not testify regarding any actual damage resulting from Crawley's conduct that could reasonably be viewed as "significant." His testimony established that, in general, during a teacher's absence, the school would be forced to absorb the cost of a substitute, and if a substitute cannot be secured, he would be forced to use one of the aides and make up the lost preparation periods later. He also did not testify to any other effect on any students or faculty. This does not amount to "significant" damage. Principal White's general commentary as to the financial effects on the school or general, hypothetical effects on the children is not the type of substantial proof and competent evidence that is demanded. See *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 37.

¶ 37    As to the second prong, the testimony of Crawley and her witness, Andrew Wamble, established that had Crawley been given a warning or been made aware that zero or unpaid days were available, she would have corrected her conduct. Crawley specifically testified that she did not believe that she was doing anything unethical and stated that, "[if] I was aware that there was such a thing as zero days, I would have definitely taken them instead of sick days." Further, Crawley was asked if knowing what she knew now, *i.e.*, that unpaid days were available, would she do anything differently, and she responded: "Absolutely. Knowing that I could take FMLA and things like that for mental health, some of the services that they spoke of, I've never heard of, and I didn't know they were available." Crawley's testimony indicates that she would have remedied her conduct had she been informed of all of the options for use of paid and unpaid time off or been given a similar warning.

¶ 38    "For conduct to be considered irremediable, the damage caused by that conduct must have been 'significant.' " *Prato*, 331 Ill. App. 3d at 862 (quoting *Board of Education of the City of Chicago*, 160 Ill. App. 3d at 776). Because the evidence did not establish that Crawley's conduct caused significant damage to students, faculty, or the school and Crawley presented evidence that she would have, in fact, corrected her conduct had she been issued a warning, I would find her conduct was remediable and the Board's decision to the contrary was against the manifest weight of the evidence.